[L. A. No. 4534. In Bank.—March 12, 1920.]

# SAN GABRIEL VALLEY COUNTRY CLUB (a Corporation), Plaintiff and Appellant, v. COUNTY OF LOS ANGELES, Defendant and Appellant.

[1] WATERS AND WATER RIGHTS — NATURAL WATER CHANNEL — LONG-CONTINUED EXISTENCE — MANNER OF CREATION IMMATERIAL. — A channel which has existed for years as the natural channel for the drainage of the watershed tributary to it has all the attributes of a water channel wholly natural in its origin, regardless of what its origin may have been in fact.

[2] ID.—CHANNEL WITH DEFINED BED AND BANKS—DRYNESS IN CERTAIN TIMES OF YEAR—WATERCOURSE.—A channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of the year and at those times when the streams in the region are accustomed to flow is a watercourse in the legal sense, although dry except in the winter and spring and at intervals even in those seasons.

[3] ID.—ACTION AGAINST COUNTY—DAMAGES TO LAND—CONSTRUCTION OF STORM DRAINS—DRAIN CONSTRUCTED BY MUNICIPALITY.—In an action against a county for damages for injury to land resulting from the construction of storm drains, no relief can be given in regard to a drain constructed by a city which merely carried into the county drains water which otherwise would have flowed into the wash into which the county drains emptied.

[4] ID.—SURFACE WATERS—RIGHTS OF LAND OWNER.—Surface waters in the legal sense are those which fall on the land by precipitation from the skies or arise in springs and spread over the surface of the ground without being collected into a definite body, and as to such, a land owner may not gather them together on his land by artificial means and discharge them on lower lying land in greater volume or in a different manner than they would naturally be discharged.

[5] ID.—DRAINAGE IMPROVEMENTS—INCREASED VOLUME OF WATER—INJURY TO LOWER OWNER—DAMAGES NOT RECOVERABLE.—An improvement for the purposes of the drainage and protection of lands

1.   Conversion of artificial into natural watercourse, notes, 14 Ann. Cas. 909; 16 L. R. A. (N. S.) 280.

2.   Distinguishing characteristic watercourse, note, 1 L. R. A. (N. S.) 756.

4.   Right to collect or divert surface water in masses, note, 21 L. R. A. 595.

5.   Right to drain surface water into watercourse, note, 24 L. R. A. (N. S.) 903.

above does not give a lower riparian owner on the stream a cause of action merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream· is thereby increased and his land is injured because of his failure to meet such increased burden.

[6] ID.—LIMITATION OF RULE.—The rule that no action lies simply because of an increase in the volume of a stream caused by improvements for drainage above is not subject to the limitation that thereby the natural capacity of the channel be not exceeded, or, in other words, that the lands below be not flooded.

[7] ID. — CONSTRUCTION OF STORM DRAINS — INCREASED VOLUME OF WATER—NONLIABILITY OF COUNTY TO LOWER OWNER.—A county is not liable for injury to land from the construction of drains for the protection of its inhabitants, where the whole effect of the drains, so far as increasing the volume of the stream was concerned, was to add no water to that already in the channel, but merely to pass such waters more completely and more speedily from one point in the channel to another, all entirely above plaintiff's land.

[8] COUNTIES—INJURY FROM IMPROVEMENT—CONSTITUTIONAL LAW.—A county is not liable under section 14 of article I of the constitution, which provides that private property shall not be taken or damaged for a public use without just compensation, for an injury inflicted by an improvement made by it which would have been *damnum absque injuria* as between private parties.

APPEAL from a judgment of the Superior Court of Los Angeles County. Lewis R. Works, Judge. Reversed.

The facts are stated in the opinion of the court.

Hickcox & Crenshaw for Plaintiff and Appellant.

A. J. Hill, County Counsel, Vincent Morgan, Deputy County Counsel, Roy V. Reppy, Assistant County Counsel, and Salisbury & North for Defendant and Appellant.

OLNEY, J.—This is an action by the plaintiff, the San Gabriel Valley Country Club, against the county of Los Angeles to recover damages for injury alleged to have been done the plaintiff's land by the construction of certain storm drains by the defendant county and to enjoin the further use of those drains. The trial court found that the plaintiff's land had, in fact, been damaged by the construc-

tion and the use of the drains and awarded the plaintiff damages, but refused an injunction. From this result both sides appeal. The trial court made detailed findings of facts, the correctness of which neither side disputes, the contention of the plaintiff being that upon the findings it is entitled to the injunction sought, as well as to damages, and the contention of the defendant being that upon the findings the injury done the plaintiff's land was *damnum absque injuria* and the plaintiff is entitled to neither damages nor injunction.

The material facts as they appear from the findings are not particularly complicated. The plaintiff's land is situate about six miles south of the base of the Sierra Madre Mountains. From the land to the base of the mountains the country rises on a gradual slope and is occupied in large part by the city of Pasadena. Back of the city there debouch from the mountains with their mouths close together two canyons known as Las Flores and Rubio. From the mouths of these canyons there extends fan-like over the plain for two or three miles a debris cone made up of material washed down by the canyon streams. These streams are dry except during and immediately after the rainy season, that is, except during the winter and spring. During the rainy season, however, they at times of storm discharge on to the plain a very large volume of water. Prior to the building up of the locality these waters on emerging from the canyons spread out over the debris cone mentioned and were dissipated without reaching the plaintiff's land.

Between 1870 and 1880 the locality became somewhat settled and the waters coming from the two canyons were confined and together formed a channel known as the Rubio Canyon Wash, in which they flowed from 1881 until the construction in 1913 of the storm drains here complained of. This channel as it proceeds down joins other washes and ultimately passes through the plaintiff's land. The channels run through a porous and sandy soil and much of the water passing down them was absorbed prior to 1913 before reaching the plaintiff's land. In times of heavy storm, also, the channels would overflow and a portion of their waters be lost in that manner without reaching the plaintiff's land.

In 1913 the defendant county, through the instrumentality of two so-called protection districts, constructed the

drains, two in number, in question here. They really are but a single drain, since the second is but a continuation of the first. They, or rather it, is a concrete box of a capacity to carry all the waters of the Rubio Wash, which it picks up by means of an intake dam near the head of the wash and empties into it again about a mile above the plaintiff's land. It follows the general direction of the wash and for some of the distance is laid in it, but for some of the distance departs from it.

In the same year the city of Pasadena constructed a drain which, apparently, although the findings are not entirely clear upon the point, picked up in similar fashion the waters of East Pasadena Wash, one of the tributaries, so to speak, of the wash passing through the plaintiff's land, and emptied such waters into the county drain at or near the point of junction of the Rubio and East Pasadena washes, with the result that from there on the county drain carried the water of both washes, just as the wash below that point had previously done.

Following the construction of these drains, in January and February, 1914, extraordinary and unusual rains occurred in the region, and a great volume of water was passed through the drain and emptied into the wash below and continuing down it, very substantially damaged the plaintiff's land. The plaintiff thereupon brought this action because of the injury so done it and the danger of similar injury being done again.

The court further finds, in effect, that the action of the county drains is solely upon the water in the washes. In other words, the drains are substitute conduits for the washes. It follows at once, and the court so finds, that so far as augmenting the volume of the stream in the wash below and passing the plaintiff's land, the action of the drains is twofold, and twofold only. First, they prevent any water escaping from the channel above in time of flood and overflowing the surrounding country and thereby being in large measure dissipated and lost. Second, they act as an impervious, and direct, smooth, and unobstructed, and, therefore, speedier conduit in place of the washes with their pervious bottoms and sides, and indirect, broken, and obstructed, and, therefore, slower channels. The amount of absorption by the porous bottoms and sides of the washes

must have been considerable, and the court so finds, and it is plain that to the full extent of this the volume of water in the stream below the drains is increased. The speedier passage of the water through the drains would also of itself augment the volume below in times of storm, at least to the extent to which it brings more nearly together at one time in the channel the storm waters from the mountains and those from the plain immediately about. But the whole effect of the drains, so far as increasing the volume in the stream is concerned, may be summed up by saying that they add no water to that already in the channel and that which would come to it on the way, but merely serve to pass such waters more completely and more speedily from one point in the channel to another, all entirely above the plaintiff's land.

So far as the velocity of the water in the wash as it passes the plaintiff's land is concerned, it is apparent that the drains do not affect it otherwise than to the extent to which the velocity is increased by an increased volume of water. The plaintiff's land is a mile or more below the lower end of the drains, and any impetus the water may have as it emerges from the drains must be lost long before reaching the plaintiff's land. There is no increase in velocity, in other words, except such as is a necessary incident of an increased volume.

The case presented by the findings is, therefore, simply one where a public authority has constructed an artificial conduit which, to the extent of its length, but no further, acts as, and only as, a substitute for a natural channel which continues on down to and through the plaintiff's land a mile or so below. It should also be noted that there is no finding and there is nothing to indicate that this artificial conduit was not a reasonable improvement for the benefit and protection of the territory through which the natural channel for which it was a substitute ran, or that it was constructed in a manner more burdensome to the plaintiff than was required for the purpose for which it was constructed. The question presented may be thus stated: Has the owner of land through which a natural water channel runs a right to complain of an improvement of that channel above his land (for the substitute conduit is but that, and has no other effect) when the improvement is a reasonable one for

the benefit of the upper land through which the channel runs and is not constructed in an unreasonable manner?

[1]   Before discussing this question there are certain matters which should be disposed of preliminarily.   We have referred to the Rubio Canyon Wash and the continuation of it through the plaintiff's land as a natural water channel.   In one sense it is not that.   It did not exist as a definite watercourse, at least as far as the plaintiff's land, before the region was settled up, but was created as the result of settlement.   Nevertheless, it is natural in the sense that it was originally made by the waters themselves and not by man, although it is possible that except for the acts of man, the waters would not have been kept together so as to make a channel.   In any event, it has now existed for such a length of time as the channel for the natural drainage of the watershed tributary to it, that the manner of its creation is not material, and it has all the attributes of a water channel wholly natural in origin.   (*City of Reading* v. *Althouse,* 93 Pa. St. 400.)

[2]   Likewise, it is a watercourse in the legal sense, although dry except in the winter and spring and very possibly at intervals even in these seasons.   It is a channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of the year and at those times when the streams in the region are accustomed to flow.   It is wholly different from a swale, hollow, or depression through which may pass surface waters in time of storm not collected into a defined stream. (*Conniff* v. *San Francisco,* 67 Cal. 45, [7 Pac. 41]; *Spangler* v. *San Francisco,* 84 Cal. 12, [18 Am. St. Rep. 158, 23 Pac. 1091]; *Los Angeles etc. Assn.* v. *Los Angeles,* 103 Cal. 461, [37 Pac. 375].)

[3]   Mention should also be made of the East Pasadena drain constructed by the city of Pasadena.   Apparently from the findings it is of the same character as the drains constructed by the county, that is, it serves only to carry waters already collected in the East Pasadena Wash and does not serve to collect other waters and add them to those already there.   But however this may be, the drain was not constructed by the county and no relief in regard to it can be given in this action, which is against the county alone. While it discharges into the county drains, this fact is not

material, since if the latter were not there, it would discharge into the wash and its waters would then, as now, pass down the wash to the plaintiff's land.

[4] It should also be observed at the outset that the present case is not concerned with surface waters. Such waters in the legal sense are those which fall on the land by precipitation from the skies or arise in springs and spread over the surface of the ground without being collected into a definite body. (*McDaniel* v. *Cummings,* 83 Cal. 515, [8 L. R. A. 575, 23 Pac. 795]; 3 Farnham on Waters, sec. 278.) As to such waters the rule has been established by numerous decisions in this state that a land owner may not gather them together on his land by artificial means and discharge them on to lower lying land in greater volume or in a different manner than they would naturally be discharged. Of this character are the following decisions cited on behalf of the plaintiff: *Conniff* v. *San Francisco,* 67 Cal. 45, [7 Pac. 41]; *Stanford* v. *San Francisco,* 111 Cal. 198, [43 Pac. 605]; *Cushing* v. *Pires,* 124 Cal. 663, [57 Pac. 572]; *Galbreath* v. *Hopkins,* 159 Cal. 297, [113 Pac. 174]; *Shaw* v. *Sebastopol,* 159 Cal. 623, [115 Pac. 213]; *Heier* v. *Krull,* 160 Cal. 441, [117 Pac. 530]; *Cox* v. *Odell,* 1 Cal. App. 682, [82 Pac. 1086]; *Peck* v. *Peterson,* 15 Cal. App. 543, [115 Pac. 327]; and *Stanford University* v. *Rodley,* 38 Cal. App. 563, [177 Pac. 175]. But the present case is not concerned with surface waters and the foregoing decisions are not in point. The waters upon which the drains here in question act have lost their character as surface waters before they reach the drains and have already been gathered into a definite body flowing as a stream in a watercourse. The difference between surface waters and those collected and flowing in a watercourse is well recognized, and the same rules by no means apply to one as to the other.

Likewise, the distinction should be observed at the outset between the present case and such decisions as *Rudel* v. *Los Angeles County,* 118 Cal. 281, [50 Pac. 400]; *Larrabee* v. *Cloverdale,* 131 Cal. 96, [63 Pac. 143]; *Wood* v. *Moulton,* 146 Cal. 317, [80 Pac. 92], and *Humphreys* v. *Moulton,* 1 Cal. App. 257, [81 Pac. 1085], which are also cited on behalf of the plaintiff. These cases were all concerned with water in watercourses and with improvements or changes in drainage. So far they resemble the case at bar. But in all

of them, unlike the present case, the improvement or change did not have the effect merely of passing down the water in a stream more completely and speedily from one point in its channel to another, but of diverting it entirely from its channel and discharging it either into a different channel in which it did not naturally flow or upon neighboring land where there was no channel.

Of these cases *Rudel* v. *Los Angeles County* is particularly relied upon, and we are referred so strongly to it as determinative here that a statement of it may not be amiss. It involved an earlier attempt by the county to dispose of the same waters as those which are now disposed of by the present drains. Instead, however, of passing these waters down to a lower point in their channel as it is now attempted to do, it was planned to divert them entirely and to discharge them into another watercourse to the east in which they did not normally flow. So to do was to impose upon such other channel the burden of carrying the drainage of a watershed not tributary to it. Upon this ground the carrying out of the improvement was enjoined at the instance of a land owner through whose property the second channel ran. The question so presented and determined is manifestly different from the question here, where the channel involved is the natural drainage outlet for the water involved and the improvement complained of is one which, as we have said, merely passes the water more completely and more speedily from one point in the channel to another, both points being entirely above the plaintiff's land.

Passing now to this question, the ultimate one in the case, it cannot be said that there is any decision in this state dealing with just such facts or which seems on a first reading to be directly in point. But when the plaintiff's position is analyzed, and the rule is ascertained upon which the plaintiff must depend as the law in order to have a cause of action, it appears clearly that such rule is opposed to previous decisions by this court and is not the law. The plaintiff's complaint is solely that the drains increased the volume and speed of the water in passing its land. No complaint is made of the manner in which the drains are constructed, or that they are not reasonable improvements for the district they are designed to protect, or that they

are unnecessarily injurious to the plaintiff, or that they bring into the channel water for which it is not the natural drainage outlet, or, in a word, that there has been any wrong committed into which there enters any factor other than simply an increase in the volume of the stream and consequent increase of speed and height produced by artificial means. The plaintiff's position is, and must necessarily be, that the owner of land through which a watercourse passes has the right to have the stream flow by exactly as it would naturally flow and may complain of any increase of volume, no matter how caused, providing only it be caused by artificial means. But this position is directly opposed to the decisions of this court that a riparian owner may construct embankments or levees along the bank of the stream to prevent the overflow and erosion of his land. (*Barnes* v. *Marshall*, 68 Cal. 569, [10 Pac. 115]; *Lamb* v. *Reclamation Dist.*, 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]; *De Baker* v. *Southern California Ry. Co.*, 106 Cal. 257, [46 Am. St. Rep. 237, 39 Pac. 610].)

The inevitable effect of such an embankment which holds the waters of the stream within its channel and prevents them from widening the channel by erosion is to increase the volume and speed of the stream at times of high water both in front of and below the embankment. Such increased volume and speed may damage lands below, and yet the decisions mentioned hold that such damage is *damnum absque injuria*. There is no essential difference between these cases and the present. Under them the county, without any liability to the plaintiff, could unquestionably have constructed dikes along the banks of the Rubio Wash, which would have held within it all overflow waters and prevented seepage through the banks. Such dikes would have increased the volume of water below, and consequently its rate of flow, and would also have passed the water along more rapidly from one point in the channel to another. But the drains here complained of serve exactly the same purpose, that of protecting the lands on each side of the stream, and have identically the same effect and no other. The only difference between the drains and such embankments is that the former accomplish their purpose somewhat more completely and effectively than the latter would. But the purpose is the same, the manner of accomplishing it,

that of restraining the waters, is the same, and the results are the same except for some difference in degree. Nor is this difference in degree material, since, to repeat, there is no contention that the drains are an unreasonable means of accomplishing the purpose for which they were built. The complaint is not against the means adopted, but against the necessary incidents of the purpose itself. But the purpose is a lawful one, and the decisions mentioned determine that no cause of action arises merely because of what is a necessary incident of the accomplishment of this purpose.

The plaintiff's position is based on the much-quoted maxim, *Aqua currit et debere currere ut currere solebat.* But there are many departures from this rule, of which the right to a reasonable use of the water in the stream by an upper riparian owner is perhaps the most familiar. The exercise of this right in most cases diminishes the flow. But there are uses which at times increase it, as, for example, where dams are put in for the use of mills and the water is allowed to escape at times in greater volume than the stream would then otherwise carry. In such a case no right of action by a land owner below exists because of the increase of volume and consequent acceleration of flow, provided the use is a reasonable one and exercised in a reasonable manner. The reason for permitting such departure from the maxim quoted is that not to do so would be largely to destroy the usefulness of the stream. (2 Farnham on Waters, secs. 475, 476.)

The present case is not wholly analogous to those just mentioned, but the reason for it is much the same, and is indeed stronger. Not to permit an upper land owner to protect his land against the stream would be in many instances to destroy the possibility of making the land available for improvement or settlement and condemn it to sterility and vacancy. Such a rule would seriously interfere with the development of the country. Because of this, and because of the necessity of permitting the utilization for drainage of the means afforded by nature for the purpose, a very great preponderance of the decisions in other states go further than it is necessary to go in this case, and hold that a riparian owner has no right to complain because the volume of water in the stream is increased by artificially draining surface waters into it above, provided only the

CLXXXII Cal.—26

stream is the natural drainage channel for the lands so drained. Furthermore, this rule is adopted regardless of whether the so-called common-law rule concerning surface waters prevails in the particular jurisdiction or, as here, the civil-law rule, which forbids the gathering together of surface waters and discharging them as a stream upon adjoining lands. If the surface waters are gathered and discharged into the stream which is their natural means of drainage, so that they come to the land below only as a part of the stream, it is held that no action lies because of their being added. (*Kauffman* v. *Griesemer*, 26 Pa. St. 407, [67 Am. Dec. 437]; *Ludeling* v. *Stubbs*, 34 La. Ann. 935; *Hughes* v. *Anderson*, 68 Ala. 280, [44 Am. Rep. 147]; *Shaw* v. *Ward*, 131 Wis. 646, [11 Ann. Cas. 1139, 111 N. W. 671]; *Peck* v. *Herrington*, 109 Ill. 611, [50 Am. Rep. 627]; *Vannest* v. *Fleming*, 79 Iowa, 638, [18 Am. St. Rep. 387, 8 L. R. A. 227, 44 N. W. 906]; *Thompson* v. *Andrews*, 39 S. D. 477, [165 N. W. 9]; *Mizzell* v. *McGowan*, 125 N. C. 439, [34 S. E. 538]; *Mizell* v. *McGowan*, 129 N. C. 93, [85 Am. St. Rep. 705, 39 S. E. 729]; *Waffle* v. *New York Cent. R. R.*, 53 N. Y. 11, [13 Am. Rep. 467].) Mr. Freeman in his note in 85 Am. St. Rep. 727, reviews very thoroughly the authorities dealing with the right to accelerate or diminish the flow of water, and upon the particular point under discussion says (page 733): "We have just noticed the difference between merely draining on to another's land, and draining into a natural channel or watercourse, which flows across such land. So far as streams or natural watercourses are concerned, there can be no doubt that on can drain into them, and thereby increase their volume without subjecting himself to liability for any damage suffered by a lower owner."

If a riparian owner cannot complain if surface waters be actually added by artificial drainage above to the volume of the stream, it must certainly be that he cannot complain of a drainage improvement which adds no water to the stream but merely protects the adjoining lands against the water already in it. The cases in which this exact question is presented are not many, but so far as we have been cited to them they all, with one possible exception, so hold. (*Daum* v. *Cooper*, 103 Ill. App. 4; *Fenton etc. R. R.* v. *Adams*, 221 Ill. 201, [112 Am. St. Rep. 171, 77 N. E. 531]; *Dorr* v. *Sim-*

*merson,* 127 Iowa, 551, [103 N. W. 806]; *Manteufel* v.
*Wetzel,* 133 Wis. 619, [19 L. R. A. (N. S.) 167, 114 N. W.
91]; *Steiner* v. *Steiner,* 97 Neb. 449, [150 N. W. 205].)

Of these cases *Fenton etc. R. R.* v. *Adams* is perhaps the
strongest. There a stream came on to the land of the de-
fendants and spread out into a marsh, where its waters
were delayed and the debris they carried in time of storm
deposited, and thence continued on down to the. plaintiff's
railroad tracks beneath which it passed by a culvert. The
defendants constructed a ditch which diverted the stream
from its channel above the marsh and conveyed it by a
more direct route with a higher gradient, avoiding the
marsh, to a point in the channel below the marsh but still
upon the defendant's land. The railroad company sought
to enjoin the maintenance of the ditch on the ground that
it would largely increase the amount of water coming to its
culvert in time of storm and would also bring to the culvert a
large amount of debris which would otherwise be deposited
above. It was held, however, that the defendants had the
right to improve the course of the stream through their
land; that the ditch, although it diverted the stream from
its channel for a portion of its distance on the defendants'
land, was nothing more than such an improvement, and that
the railroad company had no cause of action. There is no
material difference whatever between such facts and those
of the case at bar.

The possible exception mentioned to these decisions is
*Grant* v. *Kuglar,* 81 Ga. 637, [12 Am. St. Rep. 348, 3
L. R. A. 606, 8 S. E. 878]. It is, however, not possible to
ascertain just what the facts of this case were, and certainly
the statement of Judge Freeman concerning it in 85 Am.
St. Rep. 725, that the broad proposition it lays down is not
universally true, is correct. If it is to be considered as in
point here, it is opposed to the whole drift of the decisions
generally and to the weight of authority upon the partic-
ular point.

When we say that the decisions upon the exact question
here presented are not many, we are not unaware of the fact
that there are a very large number of decisions in which a
change in natural conditions increasing the volume or ac-
celerating the flow of a stream has been enjoined. But in
these cases there entered factors other than those merely of

a change reasonably made for the protection of land above and having the effect only of increasing the volume, and to that extent the speed and height of the water in the channel when it reached the plaintiff's land. There was an unlawful encroachment upon the channel, or a diverting of the course or direction of the current, or a pollution of the stream, as where the drainage was of sewage as well as of water, or some other factor which imposed upon the plaintiff a burden other than merely that the channel should serve in an increased degree as the drainage outlet for the waters which would naturally drain to and through it. [5] Our conclusion is that an improvement for the purposes of drainage of lands above does not give a lower riparian owner on the stream a cause of action merely because the improvement increases the volume of water coming to his land in the stream with the incidents necessarily accompanying such increase of volume, but without affecting the stream in any other manner. Such is the present case.

[6] There remains, however, one point which should be discussed. It is frequently stated, and some decisions perhaps hold, that the rule that no action lies simply because of an increase in the volume of a stream caused by improvements for drainage above is subject to the limitation that thereby the natural capacity of the channel be not exceeded, that is, that the lands below be not flooded. It does not appear from the findings in the present case whether the plaintiff's land was flooded or not. What does appear is that a considerable portion of it was washed away. This may well have happened without the land being actually overflowed. But however this may be, we are of the opinion that no such limitation should be adopted. On the one hand, the authority for it consists largely of dicta and casual statements, and, on the other hand, it is wholly impracticable and in many cases destructive of the rule on which it is supposed to be only a limitation. This is very clearly pointed out and the limitation rejected in *Mizell* v. *McGowan*, 129 N. C. 93, [85 Am. St. Rep. 705, 39 S. E. 729]. As is there said:

"Suppose the natural capacity of the watercourse was made the test of the rule; it would be so extremely difficult of application as practically to destroy its value. What is the natural capacity of a stream? Is it measured at low

water or at high water? Almost any stream can carry off whatever water may be made to flow into it in dry weather, or perhaps even in ordinary times. On the contrary, the clearing up of our lands is having the double effect of greatly accelerating the flow of water and at the same time filling up our streams with sand, so that very few of them can now carry the water naturally flowing into them after heavy rains.

"Again, suppose the upper tenant were compelled to regard the natural capacity of the stream, how far down would this limitation extend? Naturally, many others would drain into the same stream, so that the land owner near its mouth would get the accumulated waters of all those above him. In case of injury, how would he apportion his damages, and where would the liability of each tortfeasor begin and end? These questions, it seems to us, would severely tax the utmost ingenuity of the courts, and leave the jury in such a state of perplexity as to seriously endanger their intelligent determination of the issues."

The reasons so stated may be multiplied many fold. To them also may be added the query, Why should there be any difference between injury done by flooding and injury done in any other manner by an increase in the volume of the stream? If it be the injury alone which constitutes the wrong, why should a recovery not be permitted, whatever form the injury takes? On the other hand, if it be not the injury alone which constitutes the wrong, why permit a recovery because of it when it takes the form of flooding? The injury done by erosion, for example, is frequently much more serious than that done by flooding. It was undoubtedly so in the present case. No reason can be seen why, if injury by flooding is actionable in such a case as the present, injury by erosion should not be so likewise. Yet if the rule stated, established by the great weight of authority and based on strong considerations of public good, be subject to the limitation that the increased volume of the stream caused by drainage improvements above, otherwise lawful, do not cause injury by erosion, the rule does not in reality exist, since there can be no increase in the volume of the stream without increasing its speed and, consequently, its erosive effect, and the doing of a theoretical injury, at least, to the banks past which it flows.

Summing up the discussion, our conclusion, as we have stated, is that an improvement for the purposes of the drainage and protection of lands above does not give a lower riparian owner on the stream a cause of action merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden; and, further, that the rule is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of its channel. [7] The injury to the plaintiff's land comes directly within this rule and is therefore not actionable.

[8] It is apparently contended on behalf of the plaintiff that even if the injury be *damnum absque injuria* as between private parties, yet when the injury is inflicted by an improvement made by public authority, it must be compensated for under the provision of our constitution (art. I, sec. 14) that private property shall not be taken or damaged for a public use without just compensation. But the contrary has been directly decided since the filing of the original briefs in this case in *Gray* v. *Reclamation District,* 174 Cal. 622, [163 Pac. 1024].

It follows that the plaintiff was not entitled upon the findings either to an injunction or to damages. Judgment reversed, with directions to the trial court to enter judgment for the defendant with costs.

Shaw, J., Wilbur, J., Lennon, J., Kerrigan, J., *pro tem.,* Angellotti, C. J., and Lawlor, J., concurred.