[Civ. No. 11923. First Dist., Div. One. Aug. 26, 1942.]

MINERVA LESOINE GOVE, Appellant, v. LAKESHORE HOMES ASSOCIATION (a Corporation) et al., Defendants; CITY OF OAKLAND (a Municipal Corporation), Respondent.

Cornish & Cornish for Appellant.

Hagar, Crosby & Crosby and F. Bert Fernhoff, City Attorney, for Respondent.

KNIGHT, J.—Plaintiff appeals from a judgment of nonsuit in an action to recover damages for injury to residential property in the city of Oakland. Lakeshore Homes Association, a corporation, East Bay Municipal Utility District, and the city of Oakland were joined as parties defendant; but the association's demurrer to the complaint was sustained and no appeal was taken from the trial court's ruling, nor from the judgment of nonsuit in favor of the utility district. The appeal is narrowed down, therefore, to the question of the liability of the city of Oakland.

The evidence introduced by plaintiff shows that her home was practically destroyed by the earth sliding from beneath the concrete foundations, and that the sliding thereof was proximately caused by the negligent construction and maintenance by the city of a portion of the storm water drainage system it had built on and across lands adjoining plaintiff's property; and the evidence shows also that the department of

the city government having charge of the drainage system was given notice and had actual knowledge of the dangerous and defective condition prior to the injury to plaintiff's property, but failed and neglected to take the necessary action to protect the surrounding property from the apparent danger. The city contends that since it was within the power of the city to construct a storm water drainage system to take care of the water that fell within the watershed in which plaintiff's property was situate, and since at no time it diverted any water from outside the natural watershed into the system so constructed, the case is one of *damnum absque injuria,* and that therefore even though the damage to plaintiff's property was proximately caused by the negligent construction and maintenance of any portion of said system, plaintiff is not entitled to be compensated therefor. The city's contention cannot be sustained.

The legislative act of 1923 (Stats. 1923, p. 675; Deering's Gen. Laws, 1937, Act 5619, § 2) imposing liability upon municipalities for the payment of damages for injuries to property declares: "... municipalities ... shall be liable for injury to ... property resulting from the dangerous or defective condition of ... works and property in all cases where the ... officer or person having authority to remedy such condition, had knowledge or notice ... and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or ... take such action as may be reasonably necessary to protect the public ..." The facts of the present case, which bring it within the provisions of the foregoing statute, may be stated as follows: Plaintiff purchased the land in 1924 for $1,850, and erected a dwelling thereon at a cost of more than $10,000, and which at the time of the damage thereto was reasonably worth $7,900. The property is described on the official map as Lot 11, Block 6, South Lakeshore Glen, and is known as 794 Brookwood Road. It fronts south on Brookwood Road and is bounded on the east by the lands of the Lakeshore Homes Association through which runs Trestle Glen Creek. The north boundary of plaintiff's property lies within several feet of the south bank of the creek, but no part of her property is riparian thereto. The southerly two-thirds of her property, fronting on Brookwood Road, is fairly level, and it was on that portion that she built her dwelling. The northerly third slopes rather sharply toward the creek bank;

and the contour of the Lakeshore Homes Association's property to the east is steep throughout. The property on the southerly side of Brookwood Road is also steep, and is occupied by dwellings.

Trestle Glen Creek is approximately three miles long and its course is circuitous. Included in its watershed are 649 acres. Starting in the foothills above the city of Piedmont, it flows through a portion of that city, then into and through a portion of the city of Oakland and empties into Lake Merritt. Upon reaching the vicinity here involved, it flows through the north portion of the property of said association, takes a sharp bend to the north, and continues on westerly but does not touch plaintiff's property. It passes through the property of said association about 50 feet from and runs on a line approximately parallel with Brookwood Road, and is about 32 feet lower than the level of the road. As the land in the watershed in this particular locality became gradually utilized for residential purposes and streets were laid out and paved, less of the rain water that fell seeped into the ground, and in order to take care of the surplus water the city of Oakland in 1931 constructed certain conduits, storm drains and culverts whereby the water was collected on Brookwood Road, then conveyed across the lands of the association to Trestle Glen Creek, and a short distance below the waters of the creek are picked up in a concrete culvert and carried half a mile to Lake Merritt. That is to say, two storm water inlets were built on Brookwood Road, one on each side, just east of the easterly line of plaintiff's property and in front of that of the association; and from said inlets and connected therewith there was laid underground and across the association's property a ten-inch concrete pipe or conduit to Trestle Glen Creek, so that all storm waters falling upon said road and those drained to it by means of gutters and drains from the sides of the canyon in that locality were concentrated in said storm water inlets and then passed through said ten-inch pipe or conduit and discharged into Trestle Glen Creek at the point of the bend on the association's property. But nothing whatever was done to fortify or protect the banks of the creek at the end of the ten-inch pipe against erosion by the increased and intensified volume of water thus thrown into the creek at this point; and soon after that part of the drainage system was completed the surface strata of the soil of the association's property started to slip downward toward the creek. This caused the sidewalk on the north side of Brookwood

Road to subside and the ten-inch pipe to separate from the storm water inlets. The city engineer caused repairs to be made to the pipe and the inlets, but nothing was done at the other end of the pipe to fortify the banks of the creek or to prevent erosion. Thereafter there was a settling of the pavement of Brookwood Road which the city repaired from time to time. But during January and February of 1938 there was a heavy rainfall, which greatly increased the flow of water through the ten-inch pipe into the creek, and the banks not being protected at that point, the increased water gradually washed away the south bank. This took away the lateral support for the land above, and the earth started slipping toward the creek. The concrete pipe across the association's land was laid parallel with and close to a ten-inch water main installed by the utility district in 1924; and on February 12, 1938, on account of the earth slippage, a blow-off valve on the water main broke. This was repaired immediately; but the earth slippage continued. On February 16, 1938, the water main again broke, and was thereupon abandoned. On February 21, 1938, Ernest Held, the owner of the property across the street from plaintiff, notified the city engineer that the earth was slipping toward Trestle Glen Creek and that something besides patchwork to the pavement of Brookwood Road should be done to prevent a disaster. On March 2, 1938, the city engineer replied that he was watching the situation and would undertake a survey to see what should be done. But nothing was done, and on March 14th an extensive land crack opened. It was ''V'' shaped, and had its apex at the storm water inlet on Brookwood Road. Its east arm extended along the north edge of Brookwood Road and thence northeasterly to the creek through the property of the association. Its west arm followed a distance along the edge of Brookwood Road, thence bent northwesterly across the association's property and entered plaintiff's property about 25 feet north of the road. It ran thence northwesterly to the east side of plaintiff's house, followed along the east side of the house, cut just under the northeast corner of the house, and thence to the creek. The crack when it first appeared was about half an inch wide; but from day to day the inside of the ''V'' lowered and the crack became wider. Nothing was done by the city authorities; but plaintiff, in order to prevent her house from slipping with the earth's surface, installed a cement pillar 12 feet deep under the northeast corner. As the slide

continued, more lateral support was washed away by the waters of the creek, and in April, 1938, a second crack appeared. It paralleled the first crack generally, but crossed to plaintiff's land about 10 feet north of the north edge of Brookwood Road, ran under the southeast corner of plaintiff's house and came out about the middle of the rear, and from there ran down to the creek. It increased in intensity, the earth to the northeast slipping until it had dropped from 2 to 3½ feet. As the earth continued to slip the ground beneath the foundations of plaintiff's house slid away, and finally the plumbing was torn loose, the water pipes were broken, and the house settled and slid and was badly cracked and twisted; so that in May, 1938, plaintiff was forced to vacate.

The evidence definitely shows that the slides were due to the removal of the lateral support on the association's property by erosion of the banks of the creek where the ten-inch pipe emptied into the stream, and that had the city fortified and protected the banks from erosion at that point and constructed a culvert along a portion of the creek bed, the slippage of earth would have been prevented. But as stated, at no time, even after the slipping started in February, 1938, were any protective structures whatever placed in or along the banks of the creek; consequently the second slide took place, as the result of which plaintiff's residence was practically destroyed. Within ninety days after the damage occurred and in conformity with statutory requirements, plaintiff filed her verified claim with the city, but the claim was rejected, and thereupon she brought this action.

A nonsuit may be granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a judgment in favor of the plaintiff if such a judgment were given. (*Estate of Lances,* 216 Cal. 397 [14 P. (2d) 768], citing cases.) The same rule relating to evidentiary matters governs reviewing courts in the consideration of appeals from judgments of nonsuit. (*Montgomery* v. *Nelson,* 211 Cal. 497 [295 Pac. 1034]; *Harper* v. *Northwestern Pacific Ry. Co.,* 34 Cal. App. (2d) 451 [93 P. (2d) 821].) Applying the foregoing rules to the situation here presented, it is apparent that the evidence above narrated would have been amply sufficient upon which to base a judgment for damages in plaintiff's favor under the provi-

sions of the 1923 Municipal Liability Act, if such a judgment were given; and that being so, it must be held that the trial court's order granting the motion for nonsuit was erroneous.

As supporting its contention that the injury done plaintiff's property is *damnum absque injuria,* the city cites and relies on two cases: *San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392 [188 Pac. 554, 9 A. L. R. 1200], and *Archer* v. *City of Los Angeles,* 19 Cal. (2d) 19 [119 P. (2d) 1]. But an analysis of those cases demonstrates that for several reasons neither is here controlling. The appeal in the San Gabriel case was taken from a judgment based on findings of fact after trial on the merits, and was decided in 1919, several years before the 1923 Municipal Liability Act was enacted, and the controversy did not concern surface waters. As stated therein, the waters causing the damage had already been gathered into a definite body and flowed as a stream in a natural watercourse. Moreover, the action was brought by a property owner whose land was riparian to the stream of water which caused the damage to its property, and the issue of negligence was not involved. Summarized, the facts of that case were these: The county of Los Angeles constructed artificial conduits or drains in the natural channel of a watercourse which, to the extent of their length, but no further, acted as, and only as, a substitute for the natural channel which continued down to and through plaintiff's land a mile or so below. The conduits or drains added no water to that already in the channel and that which would come to it on the way, but merely served to pass such waters more completely and more speedily from one point in the channel to another, all entirely above plaintiff's land. Following the construction of the conduits or drains, extraordinary rains occurred in the region and a great volume of water was passed through the conduits or drains and emptied into the wash below and continued down the channel a mile or more through plaintiff's land, causing substantial damage thereto. The precise question presented in that case, as it was stated by the court, was: "Has the owner of land through which a natural water channel runs a right to complain of an improvement of that channel above his land (for the substitute conduit is but that, and has no other effect) when the improvement is a reasonable one for the benefit of the upper land through which the channel runs and is not constructed in an unreasonable manner?" Answering the question in the

negative, the court went on to say that if the plaintiff's land is riparian to the natural watercourse the burden is on him to protect his land by erecting bulkheads or other structures along the banks of the watercourse against overflow or from being washed away, and that this is so even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden; moreover, that the rule stated is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of the channel. To quote further from the opinion: ''The plaintiff's complaint is solely that the drains increased the volume and speed of the water in passing its land. *No complaint is made of the manner in which the drains are constructed,* or that they are not reasonable improvements for the district they are designed to protect, *or that they are unnecessarily injurious to the plaintiff,* or that they bring into the channel water for which it is not the natural drainage outlet, *or, in a word, that there has been any wrong committed* into which there enters any factor other than simply an increase in the volume of the stream and consequent increase of speed and height produced by artificial means.'' (Italics ours.)

Thus it will be seen that the factual situation and the legal problems there involved were entirely different from those here prescribed. Here the issue was negligence—the defective construction and maintenance of a portion of the drainage system on and over lands not belonging to plaintiff; and obviously plaintiff could not have protected her property from the apparent danger by erecting bulkheads or other structures along the banks of Trestle Glen Creek, because no portion of her property was riparian thereto.

The city calls attention to an allegation in plaintiff's complaint to the effect that the association refused to give the city permission to enter upon the association's lands to make improvements to prevent the washing away of the banks. But it appears that in its answer to the complaint the city denied that allegation; and at the trial no testimony was elicited on that question. In any event the city in the exercise of its municipal power had or could have acquired the unobstructed right of control over its entire drainage system for the purpose of maintaining the system in a proper and safe condition; and obviously the pipe line it laid across the association's

lands and the portion of the open channel of Trestle Glen Creek it used as a conduit to convey the waters to the intake of the concrete conduit in the channel below which picked up the waters in the channel and carried them on to Lake Merritt, formed two important links in the entire system. (*Kramer* v. *City of Los Angeles,* 147 Cal. 668 [82 Pac. 334].)

In the Archer case the right of recovery was based solely on article I, section 14 of the state Constitution, which requires the payment of just compensation for private property taken or damaged for public use. The Municipal Liability Act of 1923 here invoked, which imposes liability upon a municipality for injury to property resulting from "a dangerous and defective condition" of its works or property, was nowhere there involved; furthermore, the factual situation out of which the consolidated actions there arose was entirely different from the one upon which the plaintiff herein claims the right of recovery. As set forth in the majority opinion in the Archer case, the essential facts thereof were these: Surface waters from an area covering some 134 square miles drained into a stream known as La Ballona Creek, which flowed down a natural watercourse into La Ballona Lagoon. The lagoon was about two miles long and two miles wide, and the waters therefrom emptied through a natural outlet into the Pacific Ocean. As the area drained by the creek urbanized, improved drainage increased the volume of water in the creek; consequently the watercourse was artificially straightened, widened and deepened. The improvements to the drainage system and the watercourse were done by the municipal authorities. A heavy rainstorm, lasting two days, occurred at the end of 1933 and the waters swept down La Ballona Creek, overflowed the banks of the lagoon and flooded plaintiff's property located "near" the lagoon. (In the dissenting opinion it is stated they were "located some three miles north of the lagoon" and that they were not riparian to the lagoon or the creek.)

It was claimed by the plaintiffs that the flooding of their lands was due to two causes for which the defendants were responsible: draining into the creek by artificial means greater quantities of surface waters, without artificially enlarging the outlet from the lagoon to the ocean; and obstructing the flow of the water through the lagoon by the building of a bridge across the lagoon which caught debris swept down the creek. On the appeal the majority of the

court held that plaintiffs failed to show that the obstruction of the bridge contributed to the damage caused by the overflow; that the state or its subdivisions may take or damage private property without compensation if such action is essential to safeguard public health, safety or morals; that the defendants acted within the limitation of their power in draining the increased surface waters in the La Ballona Creek watershed into said creek, even though the volume of water in the creek was increased thereby; and that there was no duty imposed upon them to improve the outlet to the lagoon into which the creek emptied, even though by so doing the flooding of the nearby lands would have been prevented; that therefore the injury to the plaintiffs' lands caused by the overflow of the lagoon was *damnum absque injuria*.

The present case is fundamentally different. Plaintiff's property was not damaged by surface waters, stream waters, or flood waters. The damage was directly caused by landslides brought about, according to the evidence adduced at the trial, by a dangerous and defective condition of a portion of the public works of the municipality—a condition of which, so the evidence shows, the city officers having the authority to fix had notice and actual knowledge, but which they failed to remedy; and the plaintiff is seeking compensation for the damage under a special statute covering such case and affording such remedy. It is true, plaintiff's theory of her right to recover damages was based also on two additional legal grounds, to wit: that the city was liable because it discharged increased surface waters with concentrated and destructive force into the stream; and that irrespective of the question of negligence or liability for dumping the increased surface waters it was liable under article I, section 14 of the state Constitution. And it may be well here to state that a considerable portion of her brief has been devoted to a discussion of those two additional theories. But in view of the conclusion we have reached that plaintiff is given a complete remedy for the recovery of damages for the alleged injury to her property under the 1923 Municipal Liability Act, it becomes unnecessary to inquire into the merits of the remaining two grounds urged by her in support of the appeal.

The judgment is reversed.

Ward, J., concurred.

PETERS, P. J.—I concur. I agree with the reasoning and conclusions contained in the main opinion. There can be no

doubt but that the complaint alleges, and the evidence shows, a good cause of action under the Municipal Liability Act. However, I am also of the opinion that, independent of that act, a good cause of action has been stated and proved. There is no sound legal theory to justify the conclusion that a municipality, without liability, can collect all of the surface waters from a large drainage area, and discharge such waters into a stream with concentrated and destructive force to the damage of lower owners, where the municipality knows or should know that the stream cannot carry the increased burden. Under such circumstances, the municipality is liable under the eminent domain provisions of the Constitution. Such damage cannot be justified either under the police power or under any theory of exercising a riparian right. Although there is language in the majority opinion in the case of *Archer* v. *City of Los Angeles,* 19 Cal. (2d) 19 [119 P. (2d) 1], that sustains respondent's position in the instant case, I do not believe that the Supreme Court intended by that case to overrule well settled principles to the contrary.

A petition for a rehearing was denied September 25, 1942, and respondent's petition for a hearing by the Supreme Court was denied October 22, 1942.