[Sac. No. 2293.   Department Two.—December 18, 1916.]

A. J. TRICE, Administrator, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

NEGLIGENCE—DEATH OF RAILROAD BRAKEMAN—COLLAPSE OF CAR—ACTION UNDER FEDERAL EMPLOYERS' LIABILITY ACT—PROXIMATE CAUSE OF DEATH.—Under the Federal Employers' Liability Act, which makes employers liable in damages to their employees for injury or death resulting by reason of any defect or insufficiency due to negligence in its cars, etc., a railroad corporation cannot be held liable for the death of an experienced brakeman while engaged in switching some of the cars composing his train, from the collapse of one of such cars, where such car was shown to have been regularly and duly inspected, suitable and efficient for the character of work for which it was employed, and that its collapse was due to a violent collision caused by the negligence of the deceased.

ID.—PROXIMATE CAUSE OF INJURY.—If injury has resulted in consequence of a certain unlawful act or omission, but only through or by means of some intervening cause, from which last cause the injury followed as a direct and immediate consequence, the law will refer the damage to the last or proximate cause, and refuse to trace it to that which was more remote.

APPEAL from a judgment of the Superior Court of Stanislaus County, and from an order denying a new trial.   L. W. Fulkerth, Judge.

The facts are stated in the opinion of the court.

George F. Buck, for Appellant.

Hatton & Scott, and Cushing & Cushing, for Respondent.

HENSHAW, J.—Asa Philip McFarling was an experienced brakeman in the employ of the appellant. He met his death while in that employ under circumstances hereinafter to be narrated, and his administrator brought this action to recover damages from the defendant for having through its negligence occasioned his death. The complaint charged that the deceased at the time he met his death was a brakeman on a freight train, which train was composed of a steam locomotive and about twenty railroad cars, some of which were flat-cars and others of which were box-cars; that when this train arrived at Thalheim it became necessary to switch some of the cars composing the freight train from the main track to a side or spur track, and in this switching deceased was called upon to assist and did assist; that while the deceased was in the performance of his duty as such brakeman, and while the railroad cars were so being switched, one of the box-cars forming a part of the freight train "collapsed and became a complete wreck, and a portion of said box-car and the contents of said box-car, were precipitated on to one of the flat-cars which formed a part of the train, and which flat-car was immediately ahead of and coupled to the box-car." The deceased "was on said flat-car performing his duties as such brakeman at the time the said box-car collapsed; that portions of said box-car and a portion of the contents of said box-car, were precipitated upon and fell upon said Asa Philip McFarling," causing the injuries which resulted in his death. The gravamen of the charge of negligence is "that said box-car which collapsed and became a wreck as aforesaid, was not properly or safely constructed, but was defectively and insufficiently constructed, due to the negligence of said defendant; that said box-car was constructed of wood, and that the beams which formed the framework of said box-car were wooden beams, and that the beams which extended from the front end of said box-car to the rear end of said box-car were wooden beams, and that on said twenty-second day of April, 1913, said wooden beams which formed the framework

of said box-car were defective and insufficient, due to the negligence of defendant, and were not of sufficient strength to enable said box-car to withstand the aforesaid running and operation and use of said box-car by said defendant on said twenty-second day of April, 1913, and that said box-car by reason of the manner of its construction, and by reason of the material used in its construction, was a weak and unsafe and unfit car to be run and to be operated and used by defendant as aforesaid, and that on the twenty-second day of April, 1913, said box-car was old and worn out, and was, due to the negligence of defendant, defective and insufficient; and that by reason of its said weak and defective construction, and by reason of its said age, and by reason of its being so worn out, said box-car, on said twenty-second day of April, 1913, was, due to the negligence of defendant, wholly defective and insufficient and wholly unsafe and unfit to be run and operated by defendant as aforesaid, and was wholly defective, insufficient, unfit, and unsafe to be used for the purposes for which the same was being used as aforesaid by defendant at the time of its said collapse and of its becoming a wreck as aforesaid; and that owing to its unsafe, unfit, worn out, defective, and insufficient condition said box-car on said twenty-second day of April, 1913, was not a fit or proper or safe car to be run and operated as aforesaid and to be used for the purposes for which it was being used by defendant at the time said box-car collapsed and became a wreck as aforesaid; that said unsafe, unfit, worn out, defective, and insufficient condition of said box-car, on said twenty-second day of April, 1913, was due to the negligence of said defendant.''

This complaint would lead to the belief that the box-car in question was so old, so rotten, and so defective that it collapsed in the ordinary operation of switching. The uncontested facts, however, disclose the following: The freight train, of the crew of which McFarling was head brakeman, was composed of the locomotive, followed by six freight-cars. This train had picked up seven maintenance of way cars, which were to be switched on to a spur-track near Thalheim. These maintenance of way cars were construction cars with the usual materials, tools, and equipment to do track work. The seven cars comprised, in order, two flat-cars loaded with

lumber, one box-car which carried tools, appliances, and cement, two bunk-cars, a dining-car, and a water-tank car. Approaching Thalheim, where these maintenance of way cars were to be sidetracked, McFarling rode on the engine with the fireman and engineer and his fellow-brakeman Bays, and the method of switching the maintenance of way cars was agreed upon. But little discussion was required, for the men were experienced in railroad work, and the method adopted was a usual one. It was as follows: The train was stopped some distance before it reached the switch. In the picturesque language of the trainmen, it was then "bled out"; that is to say, the compressed air operating the air-brakes was released. While this was being done McFarling, as head brakeman, was charged with the duty of operating the switch, and in the performance of that duty he walked to this switch and tested it. Finding it in working order he threw the switch so that the engine would leave the main line track and run on to it, the plan being thus to run the engine and the regular freight-cars on to the switch. When they were safely thereon the switch was to be thrown back and the maintenance of way cars following, under the impetus given to them, were to pass ahead on the main line track. The engine would then back on to the main line track, go forward and take hold of the maintenance of way cars, back with them down the main line track until they cleared the switch, which again would be thrown so that the maintenance of way cars could be pushed on to the spur-track, after which the regular freight train on the main line track would pursue its way. When McFarling found the switch in working order, and had set it so as to connect with the spur-track, he "gave a high ball," or a signal to the train crew that all was in order for them to make this flying switch. The engineer started the train. It was under sufficient momentum to carry the maintenance of way cars on the main line track past the switch. He gave the train "slack," or checked its momentum for a moment, so that the brakeman stationed between the regular freight-cars and the maintenance of way cars could "get the pin," or uncouple the latter cars from the former. This was done. The engine, with the regular freight-cars, then shot more rapidly ahead, made the switch and passed on to it. It was the duty of McFarling, in control of the switch, when the last of these cars had thus successfully

passed on to the switch, to throw the switch so that the maintenance of way cars should continue on the main track. There was time and opportunity to perform this ordinary act of switching. His fellow-brakeman, Bays, who had uncoupled the train, and who had changed his position from the front end of the first maintenance of way car to the rear end of that car, looked at McFarling as these cars were approach, ing the switch, saw that McFarling had thrown the switch but partly over, that he seemed to hesitate as if confused, and threw it back to its former position. Bays had never seen him act in that way before. Why McFarling did not completely throw the switch is not known. He had just tested it and it was in working order, as evidenced by the fact that the engine and freight-cars had passed over it. Whether he thought he had completely thrown the switch until it was too late for him to correct his mistake will never be known, but the unquestioned fact is that the switch was not · thrown, and the maintenance of way cars proceeded to follow the freight train on to the spur-track. Bays, on a flat-car, realizing that a collision was inevitable, "cinched his brake up," and jumped. The conductor, upon the top of one of the rearward box-cars, also recognizing the inevitableness of the collision, and unable to jump, braced himself to meet it as well as possible. McFarling, who was in a place of perfect safety at his post of duty at the switching point, sprang on to the rear end of the second flat-car, immediately behind which was the box-car containing tools, cement, etc. He did this apparently for the purpose of setting the brake on the flat-car. He was seen at the brake. The collision came. The drawhead of the box-car rose over the drawhead of the flat-car, and McFarling was found with the upper part of his body on the box-car and crushed from the waist down between the end sills of the two cars. These end sills were checked and splintered but not broken, but the side sills or girders of the box-car gave way and the car "buckled." A part of the roof, the forward end, and some of the contents of the car were projected on to the flat-car. When the cars were separated McFarling's body fell to the ground, and with it a small portion of the front end of the box-car and some of the material that was in it. There is some general testimony in the record taken from the evidence given by one of the trainmen at the coroner's inquest, to the effect that when the

box-car buckled it fell on the end of the flat-car where Mc-
Farling was standing ''and just smashed him.'' But the
detailed and specific evidence is that his body was caught
between the ends of the flat-car and the box-car—their sills—
and his mortal injuries came from this crushing at and below
the waist line. The upper part of his body, which would
have been the first to sustain injury from anything falling
from above, was lying against the end of the flat-car, unin-
jured. Such is the testimony of plaintiff's witness, the county
physician of Stanislaus County, who made the official exam-
ination of the body of the deceased and testified to its con-
dition at the coroner's inquest and at the trial.

Concerning the car, witnesses for the plaintiff testified that
they examined the side girders of the car where they had
been fractured by the buckling of the car, and found the
wood to be rotten; that is to say, there were streaks of rotten
or ''punky'' wood. This defect did not show from the out-
side. ''I say, from the general appearance outside it didn't
appear so much decayed, until you pierced a hole in and
there was places I put the tool in an inch and an inch and
a half and it would bring out rotten wood.'' Defendant
showed that the car was one of the older type of its freight-
cars, which for lack of size and capacity for profitable use
in the business had been turned over to the use of the main-
tenance of way department. A complete record of its service
during the year previous to the accident was given. It was
shown that it was in regular and constant service, and had
stood up under this regular and constant service, and had
been regularly inspected by defendant's competent car in-
spector but a short time before the accident. There was
conflicting testimony to that offered by plaintiff, to the effect
that the girders were sound and in good condition. But
aside from this there was the positive and uncontradicted
testimony that the pressure exerted by this collision was of
one million pounds, and that the longitudinal sills or girders
of the car made of Oregon pine, as they were, would have
given way, even if perfectly sound, under a pressure of
approximately two hundred thousand pounds.

This action, as has been said, is brought under the Federal
Liability Act. That act provides that employers shall be
liable to their employees in damages ''for injury or death

resulting . . . by reason of any defect or insufficiency, due to its negligence, in its cars, etc.'' The evidence has been sufficiently set forth. Wherein can it be said that that evidence shows that McFarling met his death by reason of a defect due to defendant's negligence in its car? The car, it was shown, had been regularly and duly inspected. The car, it was proved, was suitable and efficient for the character of work for which it was employed. The injury, it is established, did not arise, as indicated from the allegations of the complaint, by a collapse of the car while it was being switched. It arose as the result of a use to which it was never in contemplation that the car should be put. It arose as the result of a violent collision, for the occasion of which collision the deceased, and the deceased alone, was in fault. It was the deceased's own act of negligence which brought about his death. In the absence of some rule of law prescribing the character of a maintenance of way car, no negligence can be predicated upon the use of a car such as this, which was duly inspected, which was in continuous service, and which had always stood up under the work for which it was designed, and was wrecked by a collision brought about by the deceased himself. This case in principle is precisely that of *Vizelich* v. *Southern Pacific Co.*, 126 Cal. 587, [59 Pac. 129], saving that in the latter case the collision was occasioned by a fellow-employee of the injured plaintiff, while in the case at bar it was occasioned by the injured man himself. In that case, by the faulty manipulation of a switch a switch-engine was thrown into collision. The water-tank of the engine became unfastened by the collision and injured the plaintiff. It was there held that the faulty manipulation of the switch was the proximate cause of the injury, notwithstanding whatever defect there might have been in the fastenings of the water-tank. There it was shown that the engine had been about the yard engaged in its ordinary duties, and from its ordinary employment no injury had ever resulted from the alleged insecure fastenings of the water-tank. The same is equally true of the car which was here wrecked. The same principle was announced in the earlier case of *Kevern* v. *Providence Gold etc. Mining Co.*, 70 Cal. 392, 394, [11 Pac. 740], where Wood on Master and Servant, page 812, is quoted to the effect that even where machinery is defective, so that otherwise a recovery might be had for an injury

received, yet if the promoting cause is the negligence of a fellow-servant, no recovery can be had. The same rule is laid down by Judge Cooley in the following language: "It is well settled that if injury has resulted in consequence of a certain unlawful act or omission, but only through or by means of some intervening cause, from which last cause the injury followed as a direct and immediate consequence, the law will refer the damage to the last or proximate cause, and refuse to trace it to that which was more remote." (Cooley on Torts, 2d ed., p. 73.) And that this rule finds universal acceptance will be sufficiently evidenced by the further citations to 4 Labatt's Master and Servant, 2d ed., pp. 47, 69; *Rose* v. *Gulf C. & S. F. Ry. Co.* (Tex.), 17 S. W. 789; *Quinn* v. *Galveston, H. & S. A. Ry. Co.* (Tex. Civ.), 84 S. W. 395; *Norfolk & Western R. Co.* v. *Brown,* 91 Va. 668, [22 S. E. 496].

It thus becomes unnecessary to consider any of the added propositions advanced by appellant upon its appeal. Thus, since the employer was not negligent, there is no question here of contributory negligence. The proximate cause was the sole negligence of McFarling. Equally unnecessary is it to consider rulings in the admission and rejection of evidence which are complained of.

The judgment and order appealed from are reversed.

Melvin, J., and Lorigan, J., concurred.

Hearing in Bank denied.