[Civ. No. 22560. Second Dist., Div. Two. May 15, 1958.]

N. E. YOUNGBLOOD, Appellant, v. CITY OF LOS
ANGELES et al., Respondents.

N. E. Youngblood, in pro. per., and Marvin Gross for Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, Joseph N. Owen, William E. Still and Weldon S. Weber, Deputy City Attorneys, Harold W. Kennedy County Counsel, Lloyd S. Davis, Deputy County Counsel, Crider, Tilson & Ruppé and Garvin F. Shallenberger for Respondents.

ASHBURN, J.—Plaintiff appeals from a judgment of non-suit in favor of defendants Max Rosenberg and Sons, a co-partnership, City of Los Angeles and Los Angeles County Flood Control District. The action is one for recovery of damages due to flooding and erosion of plaintiff's property during heavy rains of January, 1952.

Reviewing a nonsuit, we of course accept that evidence which is most favorable to plaintiff. His property is situated in the Pacific Palisades area of Los Angeles County, is hillside property known as 708 Greentree Road. He pur-chased the property in 1947 and built a home on a leveled area lying higher than the floor of the adjoining canyon. The property is situated a short distance south of Sunset Boulevard, which is a winding road in that vicinity and at least a half mile from plaintiff's property where it passes the subdivision of Max Rosenberg and Sons. That firm was subdividing a plateau on the top of a hill lying north of

Sunset and north of plaintiff's property, same being known as Will Rogers Riviera Estates. The settled statement on appeal indicates the intervening distance to be 1½ miles, but the briefs say ½ mile. On the west side of the subdivision is Rivas Canyon, and on the east side is Rustic Canyon. The normal drainage was and is into both of these canyons, each of which is a natural watercourse. Those canyons join south of Sunset and northeast of plaintiff's property, continuing as a single watercourse under the name of Rustic Canyon which carries the waters in a general southerly direction and passes the rear or easterly part of plaintiff's property at a distance of some 10 to 20 feet. This watercourse passes under a bridge in Brooktree Road (northeast of plaintiff's land), which bridge is maintained by the City of Los Angeles. At that point the water flows in a southwesterly direction toward the rear of plaintiff's property but normally it turns southerly before reaching same and passes at said distance of 10 to 20 feet still flowing southwesterly. The bridge at the time of the storms in question was aligned with the thread of this natural watercourse. Though his house was built in 1948, plaintiff never had any water problem before the heavy rains of January, 1952.

Downstream from plaintiff's land and extending northerly to a point about 50 feet south of same, the Los Angeles County Flood Control District had partially constructed a double pipe and wire revetment for the control of flood waters, which was 18 feet wide between its wire fences; at its northerly end it had a wing extending out at a 45-degree angle and designed to act as a funnel for the receipt of waters flowing south. This revetment was built in such manner as to be at a 45-degree angle with the course of the stream as it came through the Brooktree bridge; between the bridge and the revetment the channel made an "S" curve.

Plaintiff's expert witness, Thomas C. Shields, testified that it was not good engineering practice to construct or leave the revetment in its then condition; that the opening was too narrow, would clog with debris, and would build up a head of water upstream (i.e. toward plaintiff's property), that it was readily foreseeable that the revetment would clog up and divert south flowing waters onto plaintiff's property. "It was such a narrow opening for waters that have spread out in there that it will form a clog up orifice there so that brush or a tree or anything—even small ones—can get on

there and impinge and thus clog it up and build up the head of water here (indicating) upstream. . . ."

When the rains of January, 1952, came the runoff from the Rosenberg tract was greater than it would have been while raw land; the flood waters accumulated near the south end of the tract, overflowed the curbs, ran down the hillside, carrying considerable eroded material with it. But the direction of the flow of the water from that plateau was the same as it had been before subdividing, into Rivas and Rustic Canyons. None of the eroded material got south of or downstream from Sunset Boulevard. The water, carrying debris from other areas, went through the Brooktree Road Bridge and the volume was such as to carry it onto the rear or southeast portion of plaintiff's home property. Two large sycamore trees were situated in that part of the lot. The water backed up from the revetment, which became clogged, ate into the natural bank removing its lateral support and causing the upper part to fall or sink. Thereupon one of the big sycamores fell across the stream in such a way as to act as a dyke, retarding and preventing erosion which at that time was entirely below or south of the fallen tree. Agents of the Flood Control District were engaged in removing fallen trees and debris during the storm. Mrs. Youngblood (now deceased) told the district superintendent not to remove the fallen tree and he told her that would not be done. But it was removed and later cut into pieces and placed behind the revetment fences. (The superintendent said that was another tree.) When the tree was removed the waters which had backed up from the clogged revetment flowed north onto plaintiff's land, met those coming southwesterly through the bridge, formed a whirlpool which eroded the sloping bank away and left a cliff at the rear of the lot. There was a small amount of erosion before the tree was removed, but plaintiff testified that 90 per cent, almost 100 per cent, of it was caused by the removal of the sycamore.

Plaintiff's complaint primarily sought to charge Max Rosenberg and Sons and the city of Los Angeles with negligence through dumping upon his property storm waters in "considerably increased volume, increased velocity, and increased scouring capacity." It then alleged that this caused considerable erosion and removal of adjacent and subjacent support to plaintiff's property; "that during the erosion and loss of soil, as aforesaid, a large tree fell across the base of the hill between plaintiff's property and the waterway or

stream hereinbefore referred to, which constituted adjacent and subjacent support for the property of the plaintiff; that during said storm the defendants, CITY OF LOS ANGELES and LOS ANGELES COUNTY FLOOD CONTROL DISTRICT, removed and took away said tree, thereby removing said adjacent and subjacent support from the property of the plaintiff, which removal caused further erosion and loss of soil therefrom; all of which acts and conduct were without the knowledge, consent or approval of the plaintiff.''

The case has been discussed by counsel as if the removal of the tree were the event determining liability or absence of liability of the Flood Control District. Appellant says this was maintenance in furtherance of the general plan of the public improvement and hence is governed by *Bauer* v. *County of Ventura*, 45 Cal.2d 276 [289 P.2d 1], and *Ward Concrete Co.* v. *Los Angeles County Flood etc. Dist.*, 149 Cal.App.2d 840 [309 P.2d 546], rendering the district liable to him in inverse condemnation. Counsel for the district argue that the removal of the tree was but an exercise of the police power in an emergency created by the storm, and hence could not be the basis for any liability, citing such cases as *Short* v. *Pierce County*, 194 Wash. 421 [78 P.2d 610]; *Surocco* v. *Geary*, 3 Cal. 69 [58 Am.Dec. 385]; *Gray* v. *Reclamation Dist. No. 1500*, 174 Cal. 622 [163 P. 1024]; and *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384 [153 P.2d 950].

We have concluded that the removal of the tree is not the event which creates liability (if any there be) upon the Flood Control District. It plainly appears that the waters would have met and, creating a whirlpool, have eaten away plaintiff's land if the tree had not fallen. Upon the facts disclosed by this record the district would be prima facie liable in inverse condemnation because its uncompleted revetment diverted the waters from their natural flow onto plaintiff's land and to its damage. It is immaterial whether the construction of the revetment was negligent or the design defective or well conceived; when it directly caused damage to plaintiff's land the district became liable. This is the doctrine of *Bauer* v. *County of Ventura, supra*, 45 Cal.2d 276, *Ward Concrete Co.* v. *Los Angeles County Flood etc. Dist., supra*, 149 Cal.App.2d 840, and other cases. Bauer says, at page 283: ''It is well established that the diversion of water from its natural course resulting in damage to adjacent property is actionable. . . . But to escape liability the improvements thus described must follow the natural

drainage of the country or the natural stream.'' ▆ Ward Concrete Co., *supra,* at page 844 quotes *Clement* v. *State Reclamation Board,* 35 Cal.2d 628 [220 P.2d 897]: '' 'The construction of the public improvement is a deliberate action of the state or its agency in furtherance of public purposes. If private property is damaged thereby the state or its agency must compensate the owner therefor [citations], whether the damage was intentional or the result of negligence on the part of the governmental agency [citations].' '' ▆ The district, through its own construction within the channel below the Youngblood property, had exposed itself to liability in case of storm regardless of any falling tree. When the particular one did fall it acted as a dyke which temporarily protected defendant from the liability which otherwise would have ensued immediately. When the tree was removed the invasion of plaintiff's premises, caused by the angle and the clogging of the revetment, immediately occurred and gave rise to a cause of action. The removal of the tree, whether lawful or tortious, an exercise of police power or expropriation, an antecedent, concurrent or subsequent causing cause, could be nothing more than a contributing proximate cause and hence could not immunize the direct invasion of plaintiff's property growing out of the construction and maintenance of the revetment. Certainly it was not a superseding cause. (See *Trice* v. *Southern Pac. Co.,* 174 Cal. 89, 96 [161 P. 1144]; *Denman* v. *City of Pasadena,* 101 Cal.App. 769, 773-774 [282 P. 820]; 35 Cal.Jur.2d, § 65, p. 564.)

▆ Because of what they conceived to be the limited scope of the charge concerning the removal of the fallen tree, defendants Flood Control District and City of Los Angeles early and often throughout the trial objected to evidence concerning the revetment or the Brooktree Road bridge. The trial judge overruled the objections subject to later motions to strike. At the close of plaintiff's evidence the district moved to strike from the record ''all testimony pertaining to the revetment south of plaintiff's property, the engineering practice and construction of said revetment, as outside the scope of the pleadings.'' The motion was granted. Then followed the motion for nonsuit which was likewise granted.

Plaintiff complains of error in striking the said evidence. The point is well taken. Though the tree removal is alleged as the proximate cause of injury so far as the district is concerned, it should be evident from the above review of the facts that plaintiff could not possibly prove his charge as

to the tree being the proximate cause of his loss without also proving the surrounding facts,—the location and position of the revetment causing southbound water to impound and then reverse its flow; the flow of the southbound water through the bridge abutments onto plaintiff's land; the meeting of the southbound and northbound waters forming a whirlpool which washed out plaintiff's land. Without proof of these surrounding circumstances the bare removal of the tree would prove a sterile thing in any view of the case. With the subject evidence in the record, ground for holding the district liable was present. Without it there was no basis for a judgment against it. The striking of this evidence was erroneous and highly prejudicial for it permitted the granting of a nonsuit which should have been denied.

 Just before the nonsuit was granted plaintiff moved for leave to amend his complaint to conform to the proof; this motion was denied. It should have been granted. True, an amendment conforming to the views herein expressed would have changed plaintiff's legal theory somewhat, but that is not a valid objection to a proposed amendment. ''When the basic facts are the same a shifting from one theory of liability to another is not the substitution of a new cause of action. (*Oberkotter* v. *Woolman*, 187 Cal. 500, 504 [202 P. 669]; *Wennerholm* v. *Stanford Univ. Sch. of Med.*, 20 Cal.2d 713, 718 [128 P.2d 522, 141 A.L.R. 1358]; *Barr* v. *Carroll*, 128 Cal.App.2d 23, 33-34 [274 P.2d 717].)'' (*Smith* v. *Los Angeles Bookbinders Union*, 133 Cal.App.2d 486, 495 [284 P.2d 194].) These further observations of the Smith case are pertinent at bar: ''The absence of a vital allegation in an original complaint, resulting in the statement of no cause of action at all, does not preclude an amendment to incorporate that indispensable element of the action. The correct view is well stated in 2 Witkin's California Procedure, section 606, page 1619: 'If the original complaint *fails to state a cause of action,* because of defective pleading of the elements, it is in a sense true that the amended pleading states a new cause of action. But there is no objection to an amendment of this kind, for this is the typical next step when a general demurrer is sustained with leave to amend. The important point is that the amended complaint merely improves the formerly defective statement of the same cause of action; there is no change in the nature of the case and therefore no surprise or prejudice to the defendant. [Citations.]' Great liberality is indulged in this matter of amend-

ment to the end that lawsuits may be determined upon their merits.'' (P. 495.) To the same effect, see *Bice* v. *Stevens*, 136 Cal.App.2d 368, 379 [289 P.2d 95].)

▇ The record before us does not show the exact amendment which plaintiff sought to make in order to conform to the proof, but that is not essential to a good motion. In *Armstrong* v. *Lassen Lumber & Box Co.*, 204 Cal. 529, 531 [269 P. 453], where leave to make such an amendment was given, the right was not exercised until after an appeal had been taken, but that omission was held not fatal in the absence of a definite showing of prejudice to the opposing party. Moreover, evidence being in the record which showed prima facie liability resting upon the district, there was but a variance between the pleading and the proof. Section 470, Code of Civil Procedure, says: ''Where the variance is not material, as provided in the last section, the court may direct the fact to be found according to the evidence, or may order an immediate amendment, without costs.'' ▇ The following cases recognize the right of the court to order an amendment to conform to proof. *Younglove* v. *Hacker*, 15 Cal.App.2d 211, 217 [59 P.2d 451]; *Burrows* v. *Burrows*, 18 Cal.App.2d 275, 279 [63 P.2d 1135]; *Unruh* v. *Smith*, 123 Cal.App.2d 431, 437 [267 P.2d 52]. That should have been done here. In the instant case there was an error which in law amounts to an abuse of discretion.

The judgment of nonsuit must be reversed as to Los Angeles County Flood Control District.

▇ As to the City of Los Angeles there was a complete failure to prove a cause of action. The complaint did not allege one except to the extent that it avers the city to have participated with the flood control district in removing the fallen tree. There is no proof whatever in support of this latter allegation.

The extent of the actual showing against the city is that the Brooktree Road bridge was maintained by it and was aligned with the thread of the natural waterway which it spanned; that there had been no changes in the natural channel above plaintiff's property prior to the storms of January, 1952. Plaintiff's expert, Mr. Shields, testified that although the bridge was aligned with the thread of the stream it was at an angle of 45 degrees with the downstream revetment; that it was not good engineering practice to leave the bridge in that position and it should have been brought into alignment with the revetment or a fender should have been built

at the southwest corner of the bridge to deflect the waters away from plaintiff's land. The district's revetment was still in the process of construction at the time of the storms in question. How much time the city had had to make changes in the bridge does not appear in the record. Except as imposed by statute (see Gov. Code, § 53050 et seq.), the city was under no duty to reconstruct its bridge to conform to the Flood Control District's realignment of the channel below.

"The improvements must follow the natural drainage of the country. If the water is diverted out of its natural channel and discharged into a different channel or upon neighboring land, the diverter is liable to the owner whose land is injured by such discharge." (*Archer* v. *City of Los Angeles*, 19 Cal.2d 19, 26 [119 P.2d 1].) The city was not the diverter.

The settled statement on appeal makes no mention of plaintiff's motion to amend but the clerk's minutes show such a motion made and denied. Counsel for appellant says he tendered exhibit 59 for identification as such proposed amendment as to the city and counsel for respondent city seem to agree. That document is before us. It alleges that the bridge was so constructed and maintained "that water was wrongfully diverted and caused to flow onto plaintiff's property with a considerably increased volume, increased velocity, and increased scouring capacity"; also that the city had notice and knowledge of a defective and dangerous condition and failed to remedy same within a reasonable time after acquiring such knowledge.

The city contends rightly that this amendment, if allowed, would have introduced a new cause of action after the statute of limitations had run. The damage occurred in January, 1952, and the amendment was offered on October 10, 1956, four years and nine months after the cause of action, if any, arose.

"In determining whether a wholly different cause of action is introduced by the amendment technical considerations or ancient formulae are not controlling; nothing more is meant than that the defendant not be required to answer a wholly different legal liability or obligation from that originally stated. As the court says in the Frost case (*supra*, p. 426 [132 Cal. 421 (64 P. 705, 84 Am.St.Rep. 53)]), for the purpose of determining whether amendment is possible, the 'cause of action' referred to as furnishing the test means only the legal obligation which it is sought to enforce against the

defendant. Other courts have used almost identical language; the test is not whether under technical rules of pleading a new cause of action is introduced, but rather, the test is whether an attempt is made to state facts which give rise to a wholly distinct and different legal obligation against the defendant. The power to permit amendment is denied only if a change is made in the liability sought to be enforced against the defendant." (*Klopstock* v. *Superior Court,* 17 Cal.2d 13, 20 [108 P.2d 906, 135 A.L.R. 318].)

 Appellant virtually concedes that the amended complaint upon which the case was tried did not state any cause of action against the city. His reply brief says: "Plaintiff, of course, concedes that to establish the liability of the defendant city of Los Angeles he must allege and prove a dangerous and defective condition, notice, and failure by the defendant to remedy the condition after a reasonable time, as provided in Government Code, section 53051.

"It is obvious that the complaint does not adequately cover all of these points. It was to this end that plaintiff moved to amend his complaint to conform to proof." If the complaint stated no cause of action at all, clearly this amendment would introduce one after the expiration of three years from date of injury (Code Civ. Proc., § 338). If the removal of the tree gave a cause of action, as alleged in the complaint, it would be one based upon a common law obligation. The substitution of a statutory obligation (Gov. Code, § 53050 et seq.) would not be a mere change in theory of action but the introduction of an entirely different and new cause of action because based upon a new and different obligation. *Burnett* v. *Boucher,* 108 Cal.App.2d 37 [238 P.2d 1], and *McKnight* v. *Gilzean,* 29 Cal. App.2d 218 [84 P.2d 213], are persuasive. Those cases hold that an attempt in an automobile accident case to substitute a statutory liability for a common law one would introduce a new cause of action within the purview of the rule now under discussion.

There was no error in granting the motion of city of Los Angeles for a nonsuit, nor did the court err in refusing to permit the amendment of the complaint with respect to the city.

 The same is true of the nonsuit granted to respondent Max Rosenberg and Sons. Its subdividing of property situated a mile or half mile upstream from plaintiff did not divert the natural drainage flow at all. It merely increased and accelerated it through creating a greater runoff. So far as

Rosenberg was concerned, the water went into a natural watercourse which normally passed near plaintiff's property and it continued to flow therein. ▮ *San Gabriel Valley Country Club* v. *County of Los Angeles*, 182 Cal. 392, 402 [188 P. 554, 9 A.L.R. 1200], governs here: "If the surface waters are gathered and discharged into the stream which is their natural means of drainage, so that they come to the land below only as a part of the stream, it is held that no action lies because of their being added. . . . 'We have just noticed the difference between merely draining on to another's land, and draining into a natural channel or watercourse, which flows across such land. So far as streams or natural watercourses are concerned, there can be no doubt that on (sic) can drain into them, and thereby increase their volume without subjecting himself to liability for any damage suffered by a lower owner.' " To the same effect, see *Bauer* v. *County of Ventura*, *supra*, 45 Cal.2d 276, 283.

▮ *LeBrun* v. *Richards*, 210 Cal. 308, 316 [291 P. 825, 72 A.L.R. 336], cited by appellant, is not opposed to the cases just cited. It involved a diversion of surface waters, not mere increase in the flow of a natural watercourse. The following quotation is pertinent: " 'The upper proprietor may not divert by artificial means the surface waters upon his own lands to the lands of the lower proprietor nor may he accelerate by means of ditches or increase the drainage of his own land to the injury of the lower owner. His right "is limited to the disposition of the water through the chosen channels of nature." (*Board of Trustees* v. *Rodley*, *supra* [38 Cal. App. 563 (177 P. 175)].)' "

The judgment of nonsuit is affirmed as to defendants City of Los Angeles and Max Rosenberg and Sons, and reversed as to Los Angeles County Flood Control District with instructions to permit plaintiff to amend his complaint with respect to said defendant if so advised.

Fox, P. J., and Herndon, J., concurred.

The petition of respondent Los Angeles County Flood Control District for a hearing by the Supreme Court was denied July 9, 1958. Gibson, C. J., Traynor, J., and Spence, J., were of the opinion that the petition should be granted.