[Civ. No. 11471.    Third Dist.    Mar. 5, 1968.]

JON ZANDER, Plaintiff and Appellant, v. TEXACO, INC. et al., Defendants and Respondents; CASUALTY IN-SURANCE COMPANY OF CALIFORNIA, Defendant and Appellant.

794

796

Carr & Kennedy and Laurence J. Kennedy, Jr., for Plaintiff and Appellant.

Zonni, Ginocchio & Taylor and Edward L. Lascher for Defendant and Appellant.

Rich, Fuidge, Dawson, Marsh, Tweedy & Morris, Hewitt, McBride & Kenward, J. R. McBride, Lopez & Kennedy and Lee A. Lopez for Defendants and Respondents.

PIERCE, P. J.—Plaintiff (Zander) obtained a judgment, after a court trial, against defendant Casualty Insurance Company of California (Casualty) for $21,219.20 for damages from breach of an oral insurance "binder." Casualty appeals.[1] We will discuss and answer Casualty's contentions under appropriate captions below.

THE FACTS

On March 9, 1962, plaintiff, Zander, had recovered a personal injury judgment in Shasta County, action number 25119 against James H. Pollock and Austin M. Hughbanks in

[1]Texaco, Inc., Norman Lawrence and Shasta Trinity Oil Company were also defendants. On the theory upon which the case was decided—that a valid binder had been issued by Casualty—those defendants, as respondent Zander concedes, could not also be liable. (*Naify* v. *Pacific Indem. Co.* (1938) 11 Cal.2d 5, 13 [76 P.2d 663, 115 A.L.R. 476].) The court so held. Zander has taken a precautionary appeal from the judgment in their favor. Since we affirm the judgment against Casualty, the appeal by Zander can have impact only with reference to the assessment of costs. We will discuss this *infra*.

the sum of $21,590.18. The injuries had been suffered June 3, 1959, while plaintiff was an invitee upon service station premises known as "Buffalo Ranch Service Station" near Redding. At the time of the accident one Lucas was the owner of the service station. He had recently acquired it. Pollock and Hughbanks, copartners, operated it as tenants from month to month. The service station, under different ownership, had used Texaco petroleum products. Such products in the area were exclusively distributed by Shasta Trinity Oil Company, a corporation, of which one Holt was president and sole owner. When the change of ownership and operation of the service station had occurred Richfield Oil Company had solicited a switchover to the use of its products. Pollock and Hughbanks, in a conversation with Holt and one Sellers, the local representative of Texaco, Inc., informed them that a principal inducement of the proposed change was that Richfield proposed a "package" deal of combined fire, public liability and property damage insurance. Holt and Sellers wished to retain the business of the service station. They informed Pollock and Hughbanks they would try to negotiate the same deal with Texaco.

Defendant Lawrence, who transacted business as "Norman Lawrence Associates," was an insurance broker for Texaco Dealers Insurance Trust. Lawrence's offices were in Los Angeles. They were shared with the "Trust." That organization seems to have been a corporate device "which enabled a group of insurance policies to be issued." One Kamins was "administrator" of that trust.

Kamins and Lawrence went to Redding in response to a call from Sellers. They viewed the premises and with Sellers present held a conversation with Lucas. There is a conflict in the record whether Pollock or Hughbanks were present. (Pollock did not testify. Hughbanks testified he had not met Lawrence. Sellers, however, testified both partners were present during the conversation.) At this conference Lucas specifically asked for and obtained from Lawrence assurance that *as of that moment* the premises were insured totally and completely for fire, public liability and property damage; that coverage would include Pollock, Hughbanks and Lucas.

█ Casualty and Lawrence at the trial both contended, and contend before us, that Lawrence had no authority to "bind" Casualty. Evidence not only substantial but conclusive (to be elaborated upon below) disproves this.

On April 1, 1959, Lawrence's secretary, directed by him so

to do, sent a memorandum-letter to defendant Casualty. It named Hughbanks and Pollock as the insured, Lucas, the station owner, as an additional insured. It specified the type of insurance including: garage public liability "$100/$300,000";[2] also property damage in a specified amount. It described the premises to be insured. This memorandum-letter was inferably a notification to Casualty of issuance of an oral binder. Mrs. Judson (formerly "Moore") the secretary, testified regarding such binders: "Did you ever orally bind that company [Casualty]? A. Oh, yes, very often. Q. On one occasion or more than one occasion? A. On many occasions."

Holt sent three letters to Lawrence: one confirmed the placing of the liability insurance, a second authorized the writing of the fire insurance, the third thanked Lawrence for his efforts in retaining the service station as a Texaco outlet. These letters can only be interpreted as letter-applications for insurance covered already by the binder. Lawrence, who also confirmed the fact he had often issued binders for Casualty, did nothing personally about placing with Casualty any order for formal insurance policy or policies.

On April 13, 1959, Casualty wrote Lawrence. The caption on the letter was: "Re: Austin Hughbanks and James Pollock with Patrick Henry Lucas as an additional insured." The first paragraph of the body of the letter read: "With reference to the above captioned, *we have been holding same under binder since April 1, 1959,* and unless we are in receipt of a firm order to write prior to April 17, 1959 we will have no alternative but to discontinue coverages."

Plaintiff's evidence shows that Lawrence instructed his secretary to, and his secretary did, call Casualty which agreed to extend the binder indefinitely. (On June 12, 1959—9 days after the accident had occurred—another binder request was sent by Lawrence's office to Casualty.)

Evidence other than Lawrence's own statement and the statement of his secretary showed that Lawrence was an agent of Casualty and had authority from Casualty to bind it orally. The procedure outlined above had been used before and was continued after the accident. When the accident happened, the binder, assuming, as we must, the truth of the foregoing, had been in continuous existence for 64 days.

---

[2]Appellant Casualty's attorney in his brief suggests that $100/$300,000" should be construed as meaning a policy limit of $100 for each injury. We do not accept this. The term was the usual insurance agent's "shorthand" indicating policy limits of $100,000 for a single injury, $300,000 for a single accident.

Meanwhile, during this period, no policy or policies having been received, Pollock, Hughbanks and Lucas all became increasingly concerned. Hughbanks and Lucas got in touch with Holt. Holt communicated with Lawrence and with Sellers. He was told that policies were in the mail. This untrue intelligence was relayed to Pollock and Hughbanks.

After the accident Hughbanks asked Holt to talk to Lawrence. Lawrence then stated: "Well, nobody ever signed the policies and returned them to us, and the binder's expired." He then said: "We don't have it covered."

When Zander filed the original action, Lucas, as a Doe, Pollock and Hughbanks, under the partnership name, and the former owner of the service station, Graham, were named as defendants. Hughbanks, through his personal attorney, wrote Lawrence requesting that the pleadings be forwarded to the insurance carrier for defense of the action. Lawrence consulted a Casualty representative. A firm of adjusters, Brown Brothers, was employed. They prepared a "reservation of rights" agreement; Lucas, Pollock and Hughbanks signed it. A firm of attorneys, Newton and Braun, was retained to represent the partners. Braun of that firm undertook the defense. Brown Brothers conducted an extensive investigation. Braun was instructed to, and did, send his litigation progress reports to Casualty, marking them "Personal and Confidential." Braun's activities on behalf of the "insured" were typical of an attorney employed by an insurer in personal injury litigation to represent an insured. He took depositions. He was in frequent communication with the insurer regarding the progress of the litigation. Some months before trial Casualty, with no explanation either then or now rationalized, renounced liability not only of insurance coverage or obligation to provide a defense, but also of its liability for the attorneys' fee and expenses and for the adjusters' fee and expenses theretofore incurred. (Subsequently the latter's bill appears to have been paid. We do not know the fate of the bill of Newton and Braun. From correspondence in evidence we are aware they were unimpressed by Casualty's promise of referrals of future business as a satisfaction of the claim of the attorneys for fees already earned and expenses already incurred.) ▮ Agencies may be proved by acts as well as words. (*County etc. Bank* v. *Coast Dairies & Land Cc.* (1941) 46 Cal.App.2d 355, 363 [115 P.2d 988].) Under the overwhelming evidence before us, most of it documentary, the solemnly proclaimed denial by Casualty of the fact that the

adjusters and attorneys were its agents simply will not stick.

Judgment was obtained by Zander against Pollock and Hughbanks on March 9, 1962. Under an oral covenant not to execute, which was subsequently reduced to writing, those defendants did not appear at the trial. Pollock and Hughbanks paid Zander $370.98 upon obtaining the covenant. Plaintiff filed this complaint February 4, 1963.

### LAWRENCE'S AUTHORIZATION TO BIND CASUALTY

Insurance Code section 11580, subdivision (b) (2), provides that an insurer must answer directly to the injured person after a judgment has been obtained against the insured. All policies of public liability insurance issued in California must contain provision for such liability. This action is authorized under that section.

Issuance of "binders" called "covering notes" in the Insurance Code has statutory authorization. Duration is limited to 90 days unless extended as provided by law. (Ins. Code, § 382.) ■ California case law covers the issuance of binders. They may be oral and cover new policies; they "may be effected on behalf of an insurer by any agent possessing the authority to bind the company by contracts of insurance generally." (*Granco Steel, Inc.* v. *Workmen's Comp. Appeals Board* (1968) 68 Cal.2d 191, 197 [65 Cal.Rptr. 287, 436 P.2d 287].) The rationale for the issuance of binders has been held to be: " ' ". . . that the parties may have the benefit of them during that incipient period when the papers are being perfected and transmitted." ' " (*Granco Steel, Inc.* v. *Workmen's Comp. Appeals Board, supra,* at p. 197; *Parlier Fruit Co.* v. *Fireman's Fund Ins. Co.* (1957) 151 Cal. App.2d 6, 19-20 [311 P.2d 62].) Oral binders are described as "a common and necessary part of the insurance business." (*Parlier Fruit Co.* v. *Fireman's Fund Ins. Co., supra,* at p. 25.) ■ The identity of the insurer must, of course, exist but it is not necessary that the insurer be known to the insured. (*Granco Steel, Inc.* v. *Workmen's Comp. Appeals Board, supra,* p. 198.) ■ When the agent represents one insurer only, designation of a specific insurer is superfluous. Identity of the insurer becomes fixed and its liability commences upon the agent's oral binder. (*Granco Steel, Inc.* v. *Workmen's Comp. Appeals Board, supra,* at pp. 198-199.)

■ A contract of agency may be implied from the circumstances and conduct of the parties. The existence of an agency is a question of fact. ■ A trial court's inference from conflicting evidence is usually upheld. ■ Although the

extrajudicial declarations of one assuming to act as agent made outside the presence of the principal are inadmissible, an agent's testimony is admissible to prove the agency and authorization. (1 Witkin, Summary of Cal. Law (1960) Agency and Employment, §§ 21, 22, pp. 400, 401; *Whittaker v. Otto* (1961) 188 Cal.App.2d 619, 622 [10 Cal.Rptr. 689].) Here the agency and express authority to bind were firmly established.[3] Other documentary evidence establishes there had been no cancellation of this agency or of Lawrence's authority to ''bind'' Casualty at the time of the transaction involved here. His agency was canceled May 26, 1961.

■ ■ The argument that there was no binding contract because there was no delivery is without semblance of merit. The binder was oral. Delivery was by word of mouth. Casualty contends delivery was only to Lucas, the owner. That contention ignores evidence that one or both of the partners operating the service station were present.[4] As a reviewing court we accept that evidence as true, and since we do not reweigh evidence, we also reject Lawrence's denial of the binder under the ''substantial evidence'' rule. (*Berniker v. Berniker* (1947) 30 Cal.2d 439, 444 [182 P.2d 557].) Moreover, Lawrence's issuance of a binder is so firmly cemented by his subsequent memorandum-letter of April 1, 1959, and Casualty's letter of April 13, 1959, that argument against the issuance of a binder becomes an absurdity.

No one has explained Lawrence's failure to forward the application for formal insurance to Casualty. No one has explained why Sellers of Texaco was falsely told the policies were in the mail.

---

[3]The following notice authenticated as Casualty's act is a part of Plaintiff's Exhibit No. 16:

''December 8, 1958

To Whom It May Concern:

Norman Lawrence and Associates have been appointed with our office for six years. During these years the volume has grown to a very high productive figure while the loss ratio has always remained very low. The reason for this good loss ratio lies in the fact that this agent, his associates, and his clients are of the highest quality.

I can sincerely recommend this agent. He is a credit to the Insurance Industry.

Respectfully yours,
CASUALTY INSURANCE COMPANY
OF CALIFORNIA
Nicholas Fortunato
Los Angeles Branch Manager.''

[4]Had they not been their absence would have been immaterial. The binder to one of the insured of necessity carried with it authority to impart the issuance of the binder to the others.

When Casualty wrote threatening a cancellation of the binder, Lawrence asked for and obtained an extension. That extension was in effect when the accident occurred.

#### VARIANCE BETWEEN PLEADING AND PROOF

Zander had pleaded a negligent failure by defendants to obtain contracted-for insurance for the original defendants. The issuance of a binder is not mentioned.

Zander's original pleading is understandable. Lawrence had untruthfully insisted that the binder had been cancelled. When knowledge of the facts which Lawrence's secretary, Mrs. Judson, later testified to came to light, the picture changed. She described the receipt of Casualty's April 13, 1959, letter threatening cancellation, followed by a telephone call from her requesting an open-ended extension, with this extension confirmed by correspondence. Regardless of when *that* discovery was made, it was known by Casualty during proceedings for a summary judgment. A declaration by Mr. Mestad (Casualty's attorney at the trial) filed October 4, 1965, averred: ''That plaintiff contends that Casualty Insurance Company of California, a corporation, on or about April 1st, 1959, orally agreed to insure the defendants for liability resulting from personal injuries in the operation of the BUFFALO RANCH SERVICE STATION.''

The case was tried on the theory of the issuance of the binder. The court's findings were made on the basis of the issuance of the binder. Casualty was not surprised; it was not prejudiced in any way. Its come-lately-lament cannot now be made. (Code Civ. Proc., §§ 469, 470, 471; *Youngblood* v. *City of Los Angeles,* 160 Cal.App.2d 481, 489 [325 P.2d 587]; 2 Witkin, Cal. Procedure (1954) Pleading, § 603, pp. 1615-1617; 3 Witkin, Cal. Procedure (1954) Appeal, § 103, pp. 2274-2275; see also 2 Witkin, Cal. Procedure (1954) Pleading, § 599 et seq., pp. 1611-1629.)

#### THE COVENANT NOT TO EXECUTE AS A DEFENSE

Although the question appears to be one of first impression in California, the rule is settled in other jurisdictions that where the insurer has repudiated its obligation to defend a defendant in the absence of fraud may, without forfeiture of his right to indemnity, settle with the plaintiff upon the best terms possible, taking a covenant not to execute. Moreover, the giving of such a covenant by plaintiff (the injured party) does not bar his subsequent action directly against the insurer. (See e.g., *Mitchell* v. *Farmers Ins. Exchange* (Mo. 1965) 396 S.W.2d 647; *Metcalf* v. *Hartford*

*Acc. & Indem. Co.* (1964) 176 Neb. 468 [126 N.W.2d 471].) The reason for the rule, rather obviously, is that the injured party should not be penalized for an attempt to minimize his damages. We adopt it as applicable in California.

As a matter of fact appellant's brief seems to concede the rule. It admits that a settlement by the injured party with the insured does not release the insurer—ipso facto. Its argument is that the consideration paid by the insured to the injured party for the covenant not to execute fixes the value of the latter's claim for his injury and thus measures the extent of the insurer's liability. *Walters* v. *American Ins. Co.*, 185 Cal.App.2d 776, 785-787 [8 Cal.Rptr. 665], cited in support of this postulation, is not in point. There the *insured* was suing the insurer after a settlement and the latter urged the amount of the settlement had exceeded the value of the injured party's claim. The court held that it was a settlement in good faith made by an insured left stranded and that the insurer was barred from urging a *too-generous* settlement.

When the injured party, however, exercises his statutory right to sue the insurer after judgment a quite different situation exists. It is true that the provisions of Insurance Code section 11580, subdivision (b) (2), effectually make the injured party a third party beneficiary whose remedies are usually the same as would be available to him if he were the "contractual promisee of the performance in question" (4 Corbin on Contracts, § 810, p. 230) i.e., the insured. But it is also true that the liability of any insurer who repudiates its obligations under a policy of public liability insurance is usually (1) to pay the full amount of any judgment obtained (up to the policy limits) plus (2) all incidental expenses, plus (3) any additional damages traceable to the breach. (29A Am.Jur., Insurance, § 1460, p. 571.) The basic measure of damages in California for breach of an obligation arising from the contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) That, in the instant case, is at least the amount of the judgment recovered (see *Naify* v. *Pacific Indem. Co.* (fn. 1) 11 Cal.2d 5 [76 P.2d 663, 115 A.L.R. 476]) offset by the amount already paid the injured party by the insured. That was the amount fixed by the trial court in this case. We hold it was correctly fixed. To

hold otherwise would be to penalize a plaintiff for his attempt to minimize his damages.

## THE CHARGE OF FRAUD AND COLLUSION

Casualty pleaded an affirmative defense (once amended): that Zander on the one hand and Pollock and Hughbanks on the other had entered into an agreement after Casualty had withdrawn its defense. Under the agreement alleged, Pollock and Hughbanks (a) paid Zander $370.98 and (b) permitted Zander to have his action heard as a default matter, at which trial Zander recovered $21,590.18. Zander on his part gave a covenant not to execute. It was alleged that Pollock and Hughbanks knew that Zander did not suffer any personal injury as a result of their negligence. The agreement was stated to be "fraudulent" and "collusive."

". . . An insurer that has been notified of an action and refuses to defend on the ground that the alleged claim is not within the policy coverage is bound by a judgment in the action, in the absence of fraud or collusion. . . ." (*Geddes & Smith, Inc.* v. *Saint Paul Mercury Indem. Co.* (1959) 51 Cal.2d 558, 561 [334 P.2d 881].) The converse of that rule would be that where fraud or collusion does appear, the insurer is not bound.

But in an action by the injured party against the insurer before fraud or collusion can exist to negate the insurer's liability two matters must coincide: (a) the fraud must not be intrinsic, and (b) it must\be pleaded and shown with specificity.

Our Supreme Court in *Westphal* v. *Westphal* (1942) 20 Cal. 2d 393 [126 P.2d 105], states the distinction between "intrinsic" and "extrinsic" fraud. It says at page 397: ". . . Fraud or mistake is extrinsic when it deprives the unsuccessful party of an opportunity to present his case to the court. [Citations.] If an unsuccessful party to an action has been kept in ignorance thereof [citations] or has been prevented from fully participating therein [citation], there has been no true adversary proceeding, and the judgment is open to attack at any time. A party who has been given proper notice of an action, however, and who has not been prevented from full participation therein, has had an opportunity to present his case to the court and to protect himself from any fraud attempted by his adversary. [Citations.] Fraud perpetrated under such circumstances is intrinsic, even though the unsuccessful party does not avail himself of his opportunity to appear before the court. Having had an opportunity to protect his interest, he

cannot attack the judgment once the time has elapsed for appeal or other direct attack. [Citations.]''

In an attempt to conserve space we will not restate the reason for the distinction. It is expressed in 3 Witkin, California Procedure (1954) page 2130.

The trial court in the instant case, after an extended argument by counsel, concluded that the fraud pleaded in Casualty's affirmative defense was intrinsic. It, therefore, determined it could not be tried.

As we view the record, no determination can be made judicially by this court as to what kind of fraud Casualty was *trying to plead.*

Applying strictly the definitions of *Westphal* v. *Westphal, supra,* as quoted above, the alleged fraud we consider was neither "extrinsic" nor "intrinsic." By definition both types relate to "parties" to the litigation. The insurer was not a party. Nor could it be said to "stand in the shoes" of a party, the insured, since the insurer here points to the insured as participants in the fraud.

The terms "intrinsic" and "extrinsic" have been used more loosely. In California in *Larrabee* v. *Tracy* (1943) 21 Cal.2d 645, 650 [134 P.2d 265], it was held that the heir of an estate, not a party to the probate proceedings, was the victim of "extrinsic fraud" when she sued the executor of the estate. The executor had led her to believe that a certain legacy would go to her, then presented a claim that plaintiff's legacy had lapsed and had it distributed to him as residuary legatee.

Fraud arising during a personal injury action perpetrated by a plaintiff and a defendant insured might be, if we must apply an adjective, either "extrinsic" or "intrinsic." If one assumes skulduggery between the two conspiring to permit plaintiff to obtain a judgment upon a fictitious litigated claim, then the right of the insurer to attack the fraud would depend upon *when it had notice of the collusion.* If it had notice *before* the judgment, it could intervene to thwart the nefarious scheme while the original action was still pending and might be barred from collateral attack later if it did not do so. If, on the other hand, its knowledge reasonably came to it only after a final judgment, the fraud would be subject to collateral attack in a separate suit. In such a situation, and applied to this case, if Casualty, notwithstanding its own shabby behavior had offered proof that it had discovered fraud which it had not had a fair opportunity to present until

judgment in the original action had become final, it could raise the defense in this action.

But first Casualty would have to plead facts constituting fraud. It had had two chances. It did not do so. Its characterization (in its amended affirmative defense) of the acts of Zander and Pollock and Hughbanks as "fraud" and "collusion" was a mere hurling of epithets—drawing conclusions. Fraud must be pleaded with specificity. (2 Witkin, Cal. Procedure (1954) p. 1327.) A pleading that one or both parties knew that Pollock and Hughbanks were not liable for Zander's injuries was vague beyond acceptability even as a pleading of ultimate facts. Upon what does Casualty base its accusation? It did not inform the trial court; it has not informed us. Neither by pleading, by showing in the trial court, nor by declaration to this reviewing court has there been any suggestion of FACTS indicating any sort of fraud. (See *Mitchell* v. *Farmers Ins. Exchange, supra,* 396 S.W.2d 647, 652-654.)

The fact alone that the insured permitted Zander to take an uncontested judgment and that Zander, unopposed, proved a case under which a $21,000 judgment was pronounced by a trial court does not establish fraud. The record shows that Casualty had been informed of the proposed covenant not to execute *before* it was made and *before* the judgment. *A letter from Braun to Casualty gave the date of the trial (then two months off), informed the insurer that a covenant to execute was being negotiated and would be signed.* The letter also stated: "I am at liberty to inform you that the attorney for the plaintiff, Laurence Carr, has suggested that he is still open to negotiations if you so wish to do so." Casualty did not wish to do so. Its adjusters had thoroughly investigated Zander's claim and had been continuously in touch with Casualty. Full discovery had been had. The amount of the claim was known. In short, Casualty was fully aware of its "exposure."

A cognizable claim of fraud or collusion would have required allegations (not conclusionary epithets) that Zander had no substantial claim or chance of recovery and that the parties had permitted a judgment in Zander's favor which was disproportionate to his injuries; also that Casualty had had no notice of this in time to intervene. The reasonableness of the settlement and the good faith of the parties was never really placed in issue. The facts we have described lead us to the inevitable conclusion Casualty *had* no evidence of fraud, no evidence of collusion.

It is unnecessary to give a separate caption to an

answer to the contention that Casualty's bar of the statute of limitations should have been considered. Zander's cause of action against Casualty did not arise until a final judgment against the insured had been entered. (*Malmgren* v. *Southwestern Auto. Ins. Co.* (1932) 126 Cal.App. 135, 139 [14 P.2d 351].) Judgment in the original action was on March 9, 1962. The complaint in this action was filed February 4, 1963.

The judgment against Casualty is affirmed. The appeal by Zander from the judgments in favor of the other defendants is dismissed. Since Casualty's appeal was in the nature of a partial appeal that necessitated Zander's "protective" appeal (see fn. 1), and in the interests of justice, all costs of all parties on appeal shall be borne by Casualty.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied April 1, 1968, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied May 1, 1968.