[No. B080253. Second Dist., Div. Three. Mar. 23, 1995.]

In re DAVID H., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN'S
SERVICES, Plaintiff and Respondent, v.
ROSALINDA E. et al., Defendants and Appellants.

**Counsel**

Paula C. Mendel, under appointment by the Court of Appeal, and Marleigh
A. Kopas for Defendants and Appellants.

De Witt W. Clinton, County Counsel, and Joe Ben Hudgens, Deputy County
Counsel, for Plaintiff and Respondent.

William F. Pirtle for Minor.

**Opinion**

**CROSKEY, Acting P. J.**—Rosalinda E. and Thomas H., the parents of the
minor, David H., appeal under Welfare and Institutions Code section 395[1]
from the order of the juvenile court, entered on November 16, 1993, which
denied their motion to vacate a prior order terminating their parental rights
under section 366.26.[2]

We affirm the court's order. The court correctly found it had no jurisdic-
tion to vacate its former order terminating parental rights under section
366.26, despite the parents' claim that the order had been obtained by fraud.

[1]Unless otherwise noted, further statutory references are to the Welfare and Institutions
Code.
[2]The mother also purports to appeal from the order under section 366.26. However, that
order was entered on May 11, 1993, and the time to appeal that order passed before the
mother filed her notice of appeal on November 16, 1993.

We hold that a claim of fraud in the entry of an order terminating parental rights cannot be established where the alleged fraud consists of misrepresentations concerning the child's adoptive placement. We also conclude that the order terminating the father's parental rights (§ 366.26) was valid in spite of the fact that he was not afforded a full 12 months of reunification services.

### PROCEDURAL OVERVIEW

On June 20, 1990, when David was three weeks of age, a petition was filed to have him declared a dependent child of the juvenile court under section 300, subdivisions (b), (c) and (j), on grounds that he was neglected, was suffering severe emotional damage, or the threat thereof, by reason of the neglect, and had siblings who were abused or neglected, and there was a substantial risk the minor would be abused or neglected. On June 21, 1990, a detention hearing under section 315 was held, and the minor was ordered detained pending adjudication of the petition. The minor remained in preadjudication detention until February 5, 1992, in spite of the requirement of section 334 that a jurisdictional hearing be held within 15 judicial days. On that date, the petition was amended and sustained as amended, and David was declared a dependent child of the juvenile court under section 300, subdivision (b) (hereafter, section 300(b)).[3] On April 27, 1992, de facto parent status was granted to Ms. Kelly Reilly. The minute order for that date also noted that the matter had been referred to mediation, but had not been settled.

On June 1, 1992, a disposition hearing was held, and the minor was ordered removed from the custody and control of the parents under section 361(b). On that same date, the department of children's services (hereafter, DCS) was ordered to provide family reunification services. On November 30, 1992, the court found, under section 366.21(e), that it would be detrimental to return the minor to the parents' custody and referred the matter for a hearing under section 366.26. The minor was freed for adoption under section 366.26(c) on May 11, 1993.

On August 19, 1993, the father filed a motion to set aside the order of May 11, 1993, alleging he had agreed not to contest that order, based upon fraudulent misrepresentations made to him by the Reillys and DCS concerning the fitness of David's prospective adoptive parents. The mother joined in

---

[3]Hereafter, the subdivisions of statutes in the Welfare and Institutions Code will be referred to as, for example, section 300(a). The longer form of reference, such as section 300, subdivision (a) will be used only where multiple subdivisions are discussed or in other contexts which make the longer expression necessary.

the motion.[4] On November 16, 1993, the parents' motions were denied, the court finding that, pursuant to section 366.26, former subdivision (h),[5] it had no jurisdiction to vacate an order under subdivision (c) of that statute.

## FACTUAL BACKGROUND

The minor David H. was born on May 29, 1990, and was removed from the custody of his mother, Rosalinda E., approximately three weeks later, on June 20, 1990, owing to the mother's chronic mental condition, which rendered her unable to care for him. The mother had four other children, who were being cared for by her parents. The grandparents expressed a willingness to have David placed with them for a six-months' trial period, but doubted they would be able to care for him. David was therefore detained in shelter care, and at some point, placed in the licensed foster home of Gerald and Kelly Reilly.

David was not formally adjudicated a dependent child of the juvenile court until February 5, 1992, and was not formally ordered to be removed from his parents' custody and control under section 361 until June 1, 1992, nearly two years after he was initially detained. This unreasonable and improper delay appears to have been owing to efforts to resolve the issue of David's custody through mediation. A minute order entered on April 27, 1992 indicates the matter had been submitted to mediation, but had not been settled.

While David was in placement, the mother was repeatedly hospitalized and visited David only infrequently. The father was a full-time student, was

[4]In addition to the parents' motions to set aside the order terminating their parental rights, a petition under section 387 was filed by DCS on November 2, 1993, which alleged that the preadoptive placement was no longer found suitable for the minor. This petition was dismissed on December of 1993. On January 4, 1994, DCS filed a petition in this court for a writ of mandate (case No. B080931). We issued the writ on January 11, 1994, and ordered the juvenile court to vacate its order of dismissal and conduct an evidentiary hearing on the allegations in the section 387 petition, but on February 23, 1994, we dismissed the matter as moot.

[5]At the time of the proceedings in the trial court, section 366.26(h) provided as follows: "Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the minor person, upon the parent or parents and upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. After making such an order, the court shall have no power to set aside, change, or modify it, but nothing in this section shall be construed to limit the right to appeal the order."

Section 366.26 has since been amended to add a new subdivision (e) before former subdivision (e) (Stats. 1994, ch. 1007, § 2), and former subdivisions (e) through (k) are now subdivisions (f) through (*l*), some of which have undergone internal amendments. Former subdivision (h) is unchanged, but is now renumbered as subdivision (i).

Throughout our analysis, we shall use the current designations of all applicable statutes and subdivisions, but shall refer to earlier designations where necessary for clarity in factual or historical references.

collecting unemployment insurance, and resided with his mother, Dorothy H. During the first two years of foster care, the father visited David approximately once a month, but stated he was not able to provide for David financially and could give David a home only if Dorothy H. consented. Dorothy stated she would "have to think long and hard about it." Between his monthly visits, the father did not telephone to talk with David or inquire about his well-being. As of May of 1993, when the order terminating parental rights was entered, the father had not visited David since December of 1992.

At the selection and implementation hearing, held on May 11, 1993, the mother did not appear. The father appeared on March 25, 1993, the date originally set for the hearing, and stated he would not contest termination of his parental rights. He stated he was content to have David adopted by the Reillys, who were agreeable to maintaining contact with the birth parents. The father did not appear at the May 11 hearing.

The court admitted the social worker's report into evidence at the hearing. That report had the following to say about the prospective adoptive parents: "The prospective adoptive parents have been married for 7 1/2 years. They dated for 3 years prior to their marriage but describe their relationship as one in which they instantaneously became 'soul mates'. They are a family oriented couple and spend a lot of time with extended family members and friends. They enjoy travelling and maintain an active lifestyle. The adoptive father works as a self-employed contractor and he enjoys his work immensely. The adoptive mother works part time as a professional photographer and spends the remainder of her time caring for the minor. The family is financially stable and they live in a four bedroom home in a quiet residential neighborhood. . . . The prospective adoptive parents have demonstrated that they are committed as a couple and family to meet David's needs in every way. They have made a point of involving him in activities and providing him with an environment in which he can grow socially, physically, intellectually and emotionally. . . . The prospective adoptive parents are firm in their commitment to providing the minor with a loving, stable and nurturing home environment in the hope that he will be better able to realize his potential. They love him dearly and cannot picture their life without him. It is in all likelihood that adoptive placement papers will be signed when parental rights are terminated."

When the social worker filed the above report, she knew it to be materially false, for on May 6, 1993, Kelly Reilly had informed the social worker that the Reillys were having serious financial difficulties because Gerald refused to work, and further, these financial troubles were straining their

marriage to the extent that Kelly was contemplating divorce. Even that disclosure painted an unjustifiably rosy picture of David's potential adoptive home, for the Reillys had in fact separated on March 20, 1993, and Kelly Reilly admitted she was having an extramarital affair.

Subsequent investigation uncovered even worse news. The Reillys had recently filed for their second bankruptcy in 10 years. In addition, Gerald Reilly's children from his first marriage reported that he was an alcoholic, who had physically abused their mother, sexually molested the daughter from the age of four years to the age of seventeen, had an affair with one or more fifteen-year-old girls, and engaged in bizarre behavior, including holding his family hostage in their living room at gunpoint on one occasion until his son, Mark, was able to escape through a window and summon help from a neighbor. That same son reported that he later murdered his girlfriend by strangling her in the same manner he had seen his father strangling his mother.

After learning the truth about the Reillys, DCS filed a petition under section 387 to have David removed from their custody. In December of 1993, Commissioner Marilyn Martinez granted the Reillys' demurrer to that petition and ordered David released to Gerald Reilly. DCS thereafter filed a petition for writ of mandate in this court. (Case No. B080931.) We issued the writ and ordered an evidentiary hearing on the petition. After a hearing was held as ordered, David was released to Kelly Reilly.

A motion to vacate the termination order was filed on the father's behalf on August 13, 1993. The mother joined in that motion. At the hearing on the motion, David's counsel stated that he agreed the termination order should be vacated, and David's legal status should be conclusively resolved. On November 16, 1993, the court denied the motion, finding it had no jurisdiction to vacate its order under section 366.26. Each parent filed a notice of appeal that same day.

## CONTENTS

Both parents contend the order terminating their parental rights under section 366.26 must be vacated as having been obtained by fraud. In addition, the father contends the order made on November 30, 1992, which terminated reunification services and referred the matter for a selection and implementation hearing under section 366.26 was contrary to law, requiring reversal of the order itself and the order terminating parental rights which followed.

## Discussion

### 1. *Overview of Applicable Statutes.*

"Maintenance of the familial bond between children and parents— even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76 [23 Cal.Rptr.2d 775, 859 P.2d 1290].) However, when parents provide so inadequately for their children that the children must be removed from their homes, and the parents fail to overcome such inadequacies after reasonable assistance by public agencies, the state's interest shifts from preserving the family to providing a stable, permanent alternative home for the children. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306-307 [19 Cal.Rptr.2d 544, 851 P.2d 826].)

Under California's current dependency scheme, the process of removing children from families which fail them and the process of placing them in new homes are overlapping, yet distinct, processes, which go forward in three distinct stages. An overview of the statutes which govern each process will assist in evaluating the parents' claims in this case.

### a. *Severance of Ties With Natural Parents.*

As recently described by the Supreme Court, dependency proceedings which involve removal of a child from his or her home include four phases: jurisdiction, disposition, reunification and implementation of a permanent plan. (*In re Matthew C.* (1993) 6 Cal.4th 386, 391 [24 Cal.Rptr.2d 765, 862 P.2d 765].) The last phase, implementation of a permanent plan, begins with a determination that the parents are, and are likely to remain, unfit to care for the child. This determination may be made either at the hearing respecting removal of the child from parental custody under sections 361(b), and 361.5, subdivisions (b), (c) and (e)(1), or at a hearing respecting continued removal under section 366.21 or 366.22. (§ 366.26(c)(1).)

If the court finds by clear and convincing evidence at one of the above hearings that the parents are unfit, and the child cannot be returned to them, the court does three things. First, it orders that reunification services be terminated (§§ 366.21(h), 366.22(a), par. 2.) or, if the finding of parental unfitness is made at the initial hearing on removal, that no reunification services shall be provided (§ 361.5(b)). In addition, the court sets a selection and implementation hearing under section 366.26, to take place within 120 days. (§ 361.5(f), §§ 366.21(g)(3), 366.22(a), par. 2.) Thirdly, the court orders that a report be prepared, which must include an evaluation of the

parent-child relationship, the child's physical and mental condition, and any prospective adoptive placements. (§§ 361.5(g), 366.21(i), 366.22(b).) An order setting a selection and implementation hearing, and accompanying orders to terminate reunification services and prepare a preadoptive study, must be made within 12 months, or in some cases as long 18 months, from the date when the child was taken from the parents' physical custody. (§ 366.21(g)(1).)

■ A determination whether the child is adoptable is made at the selection and implementation hearing under section 366.26. Like the finding of parental unfitness, this determination must be based upon clear and convincing evidence. (§ 366.26(c)(1).) The sole issue at the selection and implementation hearing is whether there is clear and convincing evidence that the child is adoptable. (§ 366.26(c); *In re Marilyn H., supra*, 5 Cal.4th at pp. 300-306; *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650 [28 Cal.Rptr.2d 82].) In resolving this issue, the court focuses on *the child*— whether his age, physical condition and emotional state make it difficult to find a person willing to adopt him. (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1649.)

The present existence or nonexistence of a prospective adoptive parent— that is, a person who has filed or intends to file a petition to adopt the child (Fam. Code, § 8542)—is a factor in determining whether the child is adoptable, but is not in itself determinative. "[I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.'" (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1649, quoting *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223, fn. 11 [4 Cal.Rptr.2d 101].) Accordingly, the suitability of a potential adoptive family is irrelevant in a termination of parental rights hearing. (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1650; *In re Scott M.* (1993) 13 Cal.App.4th 839, 844 [16 Cal.Rptr.2d 766].)

If the child is found by clear and convincing evidence to be adoptable, an order is entered terminating the parents' rights of custody and control of the child. Once such an order is made and is final, it is binding upon the child, the parents and all persons who had notice of the hearing, and the court has no power to vacate or modify it. (§ 366.26(i); *In re Ronald V.* (1993) 13 Cal.App.4th 1803, 1806 [17 Cal.Rptr.2d 334].)

b. *Identification and Selection of an Adoptive Home.*

Efforts to identify an adoptive placement for a child begin as soon as the court determines the child cannot be returned to his parents' home within the

18 months allowed by the Legislature. However, the court may not make a final selection of an adoptive home until after the child's ties with the natural parents are fully severed.

As we have observed above, if the court finds at a hearing under section 361.5, 366.21, or 366.22 that a child cannot be returned to his or her parents, the court terminates reunification services or orders that reunification services not be provided, sets a selection and implementation hearing, and orders a preadoptive study. (§§ 361.5, subds. (b), (f), (g), 366.21, subds. (g), (h), (i), 366.22, subds. (a) and (b).) This study, which is received into evidence at the selection and implementation hearing (§ 366.26(b)), must include the following: (1) a description of current search efforts for an absent parent or parents; (2) a review of the contacts between the child and his or her parents during out-of-home placement; (3) an evaluation of the child's medical, developmental, scholastic, mental and emotional status; (4) a preliminary assessment of the eligibility and commitment of any prospective adoptive parent or guardian, particularly any caretaker in whose home the child is presently placed; (5) a description of the child's relationship with any prospective adoptive parent; and (6) an analysis of the likelihood that the child will be adopted. The report is prepared by the agency that is supervising the child in foster care and the licensed county adoption agency or the State Department of Social Services in counties not served by a county adoption agency. (§§ 361.5(g), 366.21(i), 366.22(b).)

In selecting an adoptive home for a child who has been freed under section 366.26, a foster parent or relative caretaker who has cared for the child is given preference over other applicants to adopt the child if the child has substantial emotional ties to that person. (§ 366.26(k); Fam. Code, § 8704, subd. (c)). However, approval of the foster family as the adoptive family is *not* automatic. "Preference" means only that the foster family's application to adopt the child will be processed and, if satisfactory, the family study shall be completed before the processing of other applications. (§ 366.26(k), par. 2.)

After an order terminating the natural parents' rights is final, a petition for adoption may be filed either in the juvenile court or in the superior court. However, a hearing on the petition can be held only *after* the natural parents' rights have been terminated, and the parents' appellate rights are exhausted. (§ 366.26, subds. (e), (j).)

The child's adoptive placement is determined under laws in the Family Code which govern adoption. These statutes govern adoptions of both dependent children who have been freed for adoption under section 366.26

and children who have been voluntarily relinquished for adoption and are found in division 13 (commencing with § 8500) of the Family Code.

If a parent voluntarily relinquishes a child for adoption, the adoption statutes provide for choice by the birth parent of an adoptive home for the child. (Fam. Code, § 8700, subd. (e).) The statutes further provide that if a child who has been voluntarily relinquished is not adopted by the family which the birth parent designated, then the birth parent may rescind the relinquishment within 30 days. (Fam. Code, § 8700, subds. (f), (g).) Parents whose rights are terminated under section 366.26 have no such choice. Section 8606 of the Family Code provides that a birth parent's consent to an adoption is not necessary "[w]here the birth parent has been judicially deprived of the custody and control of the child . . . pursuant to . . . section 366.26. . . ."

The above statutory scheme establishes a clear time limit within which the parents of dependent children of the juvenile court must become able to assume responsibility for their children, or their parental rights will be extinguished. The statutes also make clear that, once extinguished under section 366.26, parental rights may not be reasserted, except in very limited circumstances. As we shall discuss, the statutes thus afford no basis for the claims of David's parents that the termination of their parental rights must be relitigated because they were fraudulently induced to acquiesce in termination of their rights and because a hearing respecting termination was prematurely calendared.

2. *The Motion to Vacate the Termination of Parental Rights Was Properly Denied.*

The parents contend that, in two ways, the order terminating their parental rights was the product of fraud. First, they claim they were induced to acquiesce in termination of their rights, based upon false representations by the Reillys and David's social worker that David would be adopted by a stable and loving family, who would allow them a continued relationship with David. They contend they would have contested the petition if they had known the truth, and that they were effectively deprived of the opportunity to do so by the misrepresentations. Secondly, the parents claim they are entitled to relief from the order because, in making it, the court relied upon misrepresentations in the social worker's report, which was admitted into evidence.

The juvenile court found that the order was not the result of fraud and therefore concluded former subdivision (h) of section 366.26 (now subd. (i))[6] prohibited vacation of the order. The court's finding was correct.[7]

>    a. *Fraudulent Inducement to Acquiesce in Order Terminating Parental Rights.*

⬛ The claim that the parents were induced by intentional misrepresentations by the Reillys and DCS to forego a contested hearing on the issue of termination constitutes a claim of extrinsic fraud. ⬛ A court always has inherent equitable jurisdiction to vacate a judgment or order that was obtained through extrinsic fraud. (*Westphal* v. *Westphal* (1942) 20 Cal.2d 393, 397 [126 P.2d 105]; *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1061 [202 Cal.Rptr. 116]; *Baske* v. *Burke* (1981) 125 Cal.App.3d 38, 43-44 [177 Cal.Rptr. 794].) ⬛ This is no less true of an order under section 366.26 than of any other order of a court. (*In re Olivia A.* (1986) 181 Cal.App.3d 237, 242-243 [226 Cal.Rptr. 382].)[8]

Extrinsic fraud is fraud which prevents a fair adversary hearing and deprives a party of an opportunity to present his claim or defense to the court. (*Weitz* v. *Yankosky* (1966) 63 Cal.2d 849, 855 [48 Cal.Rptr. 620, 409 P.2d 700]; *Westphal* v. *Westphal, supra,* 20 Cal.2d at p. 397; see generally, 8 Witkin, Cal. Procedure (3d ed. 1985) Attack on Judgment in Trial Court, §§ 204-206, pp. 602-606.) ⬛ To be entitled to relief from a judgment on the ground of extrinsic fraud, a party must show he or she had a meritorious defense, which would have been raised but for the other party's wrongful conduct (*Page* v. *Insurance Co. of North America* (1969) 3 Cal.App.3d 121, 130 [83 Cal.Rptr. 44]; see generally, 8 Witkin, Cal. Procedure, *supra,* Attack on Judgment in Trial Court, § 216, p. 620), and also must establish all of the elements of fraud (*Zander* v. *Texaco, Inc.* (1968) 259 Cal.App.2d 793, 805-806 [66 Cal.Rptr. 561]; see generally, 5 Witkin, Cal. Procedure, *supra,* Pleading, §§ 828-829, pp. 273-275), which include an intentional or reckless misrepresentation and justifiable reliance on the

---

[6]As we note in footnote 5, *ante,* section 366.26 has been amended, and most of its subdivisions, including former subdivision (h), have been renumbered.

[7]At least, the order was correct as to the parents. Whether there was fraud or other wrongdoing as to David himself is another question, which we do not address. David, of course, was left parentless without the certainty of a new and secure home which he would, with reasonable probability, have had, absent the misrepresentations. Nothing we say in this opinion forecloses any right of action which David may have as a result.

[8]In *In re Olivia A.*, the court construed former Civil Code section 238, which limited the court's authority to vacate or modify an order terminating parental rights under former Civil Code section 232. (181 Cal.App.3d at pp. 242-243.) The provisions of Civil Code section 238 were substantially identical to those of section 366.26, subdivision (i), and the reasoning of *Olivia A.* applies equally to both statutes.

misrepresentation by the aggrieved party. (*Gonsalves* v. *Hodgson* (1951) 38 Cal.2d 91, 100-101 [237 P.2d 656]; *Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 374-375 [122 Cal.Rptr. 732].)

■ David's parents have not attempted to establish that they had a meritorious defense to termination of their rights. One doubts they could successfully do so, given the mother's ongoing mental illness, the father's inability or unwillingness to provide a home for David, and both parents' meager contact with their child. However, we shall assume for the sake of argument that the parents had at least a colorable defense.[9]

Even making this assumption, the parents' claim of fraud must fail. As we have observed, when parental rights are terminated under section 366.26, the child's adoptive placement is not determined until *after* the order terminating parental rights is final. Thus, it is not, as a general matter, legally possible at or before the time of a selection and implementation hearing, for assurances to be made respecting the child's adoptive placement. While the parents themselves may not have understood all of the legal implications of the pendency of a selection and implementation hearing, they were at all times represented and advised by counsel, who is charged with knowledge of the controlling law.

In any event, the record indicates the parents were informed that there was no guarantee David would be placed with any particular family. The social worker's report prepared for the selection and implementation hearing, a copy of which was presumably furnished to each parent, stated only that David would "in all likelihood" be adopted by the Reillys. No promises were made. Further, on March 25, 1993, the date originally set for the selection and implementation hearing, the court observed that an adoption study had not been finalized, and granted a request by the mother's attorney to continue the hearing pending completion of the study. It does not appear from the record that an adoption study had been completed by the May 11, 1993, hearing. Nevertheless, neither parent's attorney objected to entry of the order terminating rights. Neither parent personally appeared at that hearing. Under these circumstances, there was no basis for justifiable reliance upon any representations concerning David's adoptive placement, hence there can be no claim of extrinsic fraud, such as would justify vacating the order.

---

[9]Although termination of parental rights is the preferred disposition at a hearing under section 366.26 if the child is adoptable, a less drastic alternative may be selected if the parents have maintained regular visitation with the minor, and the minor would benefit from continuing the relationship (§ 366.26(c)(1)(A).) Here, the mother visited David infrequently and sporadically; the father visited regularly, but only once a month.

b. *False Evidence.*

■ The parents next claim the termination order is fatally infected because, in making it, the court relied upon false evidence in the social worker's report. This amounts to a claim of "intrinsic fraud." ■ However, "intrinsic" fraud, which includes the presentation of false evidence in the proceedings, is not a basis for equitable relief from the resulting judgment. (*Westphal* v. *Westphal, supra,* 20 Cal.2d at p. 397; *Adoption of Bonner* (1968) 260 Cal.App.2d 17, 22 [66 Cal.Rptr. 812]; see generally, 8 Witkin, Cal. Procedure, *supra,* Attack on Judgment in Trial Court, §§ 221-222, pp. 625-627.)

■ In any event, the challenged misrepresentations related to matters that are not crucial in a hearing respecting termination of parental rights. As we have observed, the *sole* issue at the selection and implementation hearing is whether the child is adoptable (§ 366.26, subd. (c); *In re Marilyn H., supra,* 5 Cal.4th at pp. 300-306), and in resolving the issue, the focus is *the child*—whether his age, physical condition and emotional state make it difficult to find a person willing to adopt him. (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1649.) The present existence or nonexistence of a prospective adoptive parent is not determinative, and accordingly, the suitability of a potential adoptive family is irrelevant. (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1650; *In re Scott M., supra,* 13 Cal.App.4th at p. 844.)

Here, the record does not indicate any facts that would have made David unlikely to be adopted. Indeed, he appeared highly adoptable, for it was reported that David was healthy, developing normally, and performing above average for his age at the time of the selection and implementation hearing. Based upon this assessment of David, there would have been no legal basis for a permanent plan other than adoption, regardless of any assessment of the Reillys.

c. *Right to Rescind Acquiescence in Termination of Parental Rights.*

■ In concluding it had no jurisdiction to vacate the order terminating parental rights, the court relied upon *In re Ronald V., supra,* 13 Cal.App.4th 1803 (*Ronald V.*). In that case, a mother acquiesced in termination of her parental rights on the understanding that the anticipated adoptive father—a former boyfriend of the mother—would allow her an ongoing relationship with the child. However, the prospective adoptive father died before the adoption took place. The mother thereafter petitioned the court under section 388 to modify the order terminating her parental rights, to order long-term foster care instead of adoption, and to grant her the status of a de facto

parent. (13 Cal.App.4th at p. 1805.) The court ruled in *Ronald V.* that former section 366.26(h) (now § 366.26(i)) precludes modification of an order terminating parental rights on the ground of changed circumstances. (13 Cal.App.4th at p. 1806.)

The discovery of the true circumstances of the Reillys in this case can hardly be characterized as a "change" of circumstances. Nevertheless, we hold that the same principles which precluded modification of the order in *Ronald V.* also preclude vacation of the order challenged here, despite the different facts of this case.

Initially, we must reject the parents' effort in their briefs to characterize their acquiescence in termination of their rights as the equivalent of a voluntary relinquishment of David for adoption. Because the parents acquiesced to termination in reliance upon intentional misrepresentations, they contend they are entitled to rescind their acquiescence and have a contested termination hearing. But a termination of parental rights under section 366.26—whether contested or uncontested—is not the equivalent under the statutes of a voluntary relinquishment of a child. A parent who voluntarily relinquishes a child is accorded choice of an adoptive home for the child (Fam. Code, 8700, subd. (e)) and also has a right to rescind the relinquishment within thirty days if the child is not adopted by the parent's chosen adoptive family (Fam. Code, § 8700, subds. (f), (g)). Parents whose rights have been terminated under section 366.26 are not entitled to choose the adoptive family (Fam. Code, § 8606.), and we are aware of no authority which allows parents who face a probable termination of their rights to condition acquiescence in the termination upon a right to designate or influence the adoptive placement.

Nor can we imagine any reason in policy why parents should have, or should be able to bargain for, such a right. Parents whose children are the subject of a hearing under section 366.26 are not in a comparable position to parents who are faced with an imposition of *limits* on their parental rights in the early stages of dependency proceedings. This is so because, in the initial phases of dependency proceedings, the preservation of the family unit is presumed to be in the best interests of the child, as well as the parents. Parents facing *termination* of their rights simply have no recognized interest in the child's future and, thus can have no right, in effect, to "plea bargain" for such an interest, as the parents apparently endeavored to do in this case. It follows that parents in this position likewise have no right to rescind an acquiescence if the adoptive placement proves unsatisfactory to them.

Parental rights are terminated because (1) the parents have been found so derelict in their duties to their children, or so unable to fulfill those duties,

that it would be harmful to return the child to their custody (§ 366.21(e); § 366.22(a)), and (2) the child has a chance of finding a caring, stable and nurturing home elsewhere (§ 366.26(c).) In David's case, he was freed from inadequate parents, but his prospective adoptive home proved to be a mirage and a hoax. It would be a tragic anomaly if the derelict parents could now further impede David's chances of finding a secure home by forcing relitigation of the permanent plan on the ground of injuries they feel were done to *them*.

As a general matter, it would be inimical to the policies underlying the juvenile court law to allow parents to raise a collateral challenge to an order terminating parental rights on the ground that the child's posttermination placement did not meet with the parents' expectations. Such relief is not available, whether the parents' expectations were not met because of an uncontrollable turn of fate (*Ronald V., supra,* 13 Cal.App.4th at pp.1805-1806) or for any other reason, including intentional misrepresentations concerning the potential placement. (§ 366.26(i).)

### 3. *The Order Terminating Reunification Services Was Correct.*

■   The father next contends the court prematurely and unlawfully ordered a hearing under section 366.26. He argues that the impropriety of this order, which set the stage for the termination of his parental rights, furnishes a further ground for overturning the order under section 366.26. A short answer to this contention is that the father did not challenge the order for a hearing under section 366.26 by way of a petition for extraordinary writ, although he was entitled to do so (former § 366.26, subd. (k)), nor did he challenge the order by way of appeal from the subsequent order under section 366.26, as he was also entitled to do. (*In re Matthew C., supra,* 6 Cal.4th at p. 401.)[10] As the time to appeal the termination order has passed, any infirmity in it which might have flowed from errors in earlier proceedings is waived.

In any event, the order setting the selection and implementation hearing was correct. The father's challenge to the order is based upon section

---

[10]At the time parental rights were terminated in this case, section 366.26(k) provided: "An order by the court directing that a hearing pursuant to this section be held is not an appealable order, but may be the subject of review by extraordinary writ." In *In re Matthew C., supra,* 6 Cal.4th 386, the Supreme Court construed section 366.26(k) to mean that an order setting a selection and implementation hearing was not appealable *when entered,* but, like any interlocutory order, could be challenged on appeal from the final judgment. (6 Cal.4th at p. 401.) In the 1994 amendment to section 366.26, which became effective January 1, 1995, the Legislature enacted subdivision (*l*), which prohibits review *at any time* of an order setting a hearing under section 366.26, if review is not first sought by a timely filed writ petition.

366.21(e). That subdivision provides that if a minor is removed from his parents' custody and control under section 361, and is not returned home after the first six-month review hearing, reunification services shall be provided for an additional six months, except in limited circumstances which do not exist here.[11] The father correctly points out that the court did not comply with that requirement. David was formally adjudicated a dependent child on February 5, 1992 and was formally ordered removed from his parents' custody on June 1, 1992. He was referred for a selection and implementation hearing on November 30, 1992, two days less than six months after the order which formally removed him from his parents' custody.

What the father neglects to mention in his argument to us is that David was first physically removed from his parents' custody on approximately June 20, 1990, and he remained outside of their custody continuously from that time until the challenged order was entered, a period of two years, five months and ten days. After that length of time, the court was required by other statutory provisions to set a selection and implementation hearing within 120 days. (§§ 361.5(a), 366.21(g)(1).) Where a child has been re- moved from his parents' physical custody and has not been returned home after a hearing under section 366.21, subdivision (e) or (f), 366.21(g)(1) requires that a hearing to determine whether the child should be referred for adoption must be held within 18 months "of the date the child was *originally taken from the physical custody* of his or her parent or guardian." (Italics added; see also section 361.5(a).) The language in section 366.21(g)(1) which sets the maximum time in which to order a selection and implemen- tation hearing is significantly different from that in section 366, which requires review hearings to take place every six months, "as calculated *from the date of the original dispositional hearing*." (Italics added.)

Section 366.21, subdivisions (e) and (g)(1) seem to impose conflicting requirements in this case. However, the conflict arises only because of a prior failure to comply with statutes which govern the jurisdictional phase of dependency proceedings. Section 334 requires a jurisdictional hearing under section 300 to be held within 15 judicial days if a minor, who is alleged to come within the descriptions in section 300, is detained outside of the home pending such hearing, as was the case with David. Section 352 provides that continuances of hearings in dependency proceedings may be granted only

---

[11]The circumstances which excuse the court from ordering additional reunification services are: (1) the child was removed from the parent's home under section 300, subdivision (g), and the parent's whereabouts remain unknown, or (2) the parent has failed to contact the child during the preceding six months, or (3) the parent has been convicted of a felony indicating parental unfitness. (§ 366.21, subd. (e), par. 2; rule 1460(f)(2)(A), Cal. Rules of Court; *In re Monique S.* (1993) 21 Cal.App.4th 677, 682 [25 Cal.Rptr.2d 863].)

upon a showing of good cause, which must be set forth on the record, and further provides that no continuance may be granted which is contrary to the best interests of the minor. In considering the minor's interests, section 352 requires the court to give substantial weight to the minor's need for prompt resolution of his custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. (§ 352(a).)

If the child has been removed from his parents' physical custody, section 352(b) provides that no continuance shall be granted that would result in the dispositional hearing under section 361 being completed more than 60 days after the detention hearing, except in exceptional circumstances, which must be set forth on the record. *In no event* may a continuance be granted that would cause the dispositional hearing to be completed more than six months after the first hearing on a dependency petition, at which the court is required by section 319 to make an additional inquiry as to the necessity of continued detention of the child outside his parents' home. (§ 352(b).) In this case, David remained detained for nearly *two years* before the dispositional hearing was completed, and the record contains no explanation for the inordinate delay, except for the cryptic notation in the minute order of April 27, 1992, to the effect that the case had been referred for mediation, but had not been settled.

As a result of the trial court's failure to comply with sections 334 and 352, David remained in preadjudication detention for nineteen and a half months —more than the entire time allowed under subdivision (g)(1) before a matter must be referred for a selection and implementation hearing. Under the circumstances, the conflict between section 366.26, subdivisions (e) and (g)(1) plainly must be resolved in favor of subdivision (g)(1) and the policies which it serves.

The two statutory provisions must be construed with reference to whole system of dependency law, so that all parts may be harmonized. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 307; *In re Michael G.* (1988) 44 Cal.3d 283, 296 [243 Cal.Rptr. 224, 747 P.2d 1152].) We also are required to construe a statute so as to effect the apparent legislative intent and avoid absurd results. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

The Legislature has determined that a parent who has a child removed for neglect or abuse should be provided with assistance in overcoming the problems that led to the removal. Thus, the dependency scheme generally requires that parents be offered reunification services. However, the Legislature has also recognized that children must not spend their lives in the

limbo of foster care and has limited those services to "a *maximum* time period not to exceed 12 months" (§ 361.5(a)), which under certain circumstances may be extended to 18 months. (§§ 361.5(a), 366.21(g)(1); *In re Jasmon O.* (1994) 8 Cal.4th 398, 421 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; *In re Zacharia D.* (1993) 6 Cal.4th 435, 446 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

Nowhere is it provided that a *minimum* of 12 months of services is required. To the contrary, the emphasis throughout the statutes is upon setting outside limits to the length of time a child may be kept in foster care before a permanent plan is established. "[O]nce court intervention is determined necessary, children and parents should receive appropriate legal representation, *time-limited* and clearly focused protective and/or reunification services, and permanency planning *at the earliest possible stage* for those children who cannot live safely with their family [*sic*]." (Sen. Select Com. on Children & Youth/ Sen. Bill No. 1195 Task Force Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988) p. 2, italics added; see also *In re Zacharia D., supra,* 6 Cal.4th at p. 446.)

It would be absurd and plainly contrary to the legislative intent of prompt resolution of the custody status of children to construe section 366.21(e) as requiring a full 12 months' wait before the settlement of a child in a secure home, despite a delay of over 18-months in the initial adjudication of dependency. Where parents request or accede in delays in adjudicating the dependency of a child, and such delays cause the requirement in section 366.21(e) to conflict with the 18 month limit in section 366.26(g)(1), the parents may not complain if a hearing under section 366.26 is ordered after an abbreviated period of reunification services. In such a case, subdivision (e) must be construed as merely "directory," and failure to comply must not invalidate an order setting a selection and implementation hearing. (*In re Richard S.* (1991) 54 Cal.3d 857, 865 [2 Cal.Rptr.2d 2, 819 P.2d 843] [A "directory" statutory requirement imposes upon the state a duty to act in a particular way, and yet failure to do so does not void an action taken in violation of the duty.]; see also *People* v. *McGee* (1977) 19 Cal.3d 948, 959 [140 Cal.Rptr. 657, 568 P.2d 382].)

Parents are not denied due process by the construction of section 366.21 which we adopt here. Our Supreme Court has characterized reunification services as one of several "significant safeguards," which are built into the dependency scheme to assure that due process is afforded to parents. (*In re Marilyn H., supra,* 5 Cal.4th at pp. 307-308.) However, that characterization does not imply that a minimum of 12 months of reunification services is an

indispensable requirement of due process. To the contrary, the Supreme Court has held that, when a child has been in foster care because of parental neglect or incapacity for an extended period of time, it is within the court's discretion to decide that the child's interest in stability has come to outweigh the natural parent's interest in the care, custody and companionship of the child. (*In re Jasmon O.*, *supra*, 8 Cal.4th at p. 421.)

Here, after nineteen and a half months of preadjudication detention, four additional months before a formal dispositional order, and six months (less two days) in which reunification services were provided, the juvenile court could reasonably find by clear and convincing evidence, as it did, that the length of time for which services were offered was reasonable. It was thus within the court's discretion to terminate services, based upon that finding and its additional finding that it would be detrimental to David to be returned to his parents' custody.

In sum, after David had spent two and a half years—all but three weeks of his life—in foster care, due process did not require him to await further efforts in his parents' behalf before those charged with his care could focus their efforts upon David's increasingly urgent need for a secure home. The order setting a hearing under section 366.26 was entirely proper.

### DISPOSITION

The order of November 16, 1993, which denied the parents' motion to vacate the order of May 11, 1993, which terminated their parental rights, is affirmed.[12]

Kitching, J., and Aldrich, J., concurred.

---

[12]Prior to hearing oral argument, we contemplated reversing the order appealed from and ordering that the parents be afforded an opportunity to file a motion under section 388. In contemplation of this result, we solicited and obtained all parties' stipulation for an early issuance of the remittitur, so as to minimize the delay in finally determining David's custody status. Obviously, the parties are released from the burden of that stipulation in view of the different result which we now announce.